SUPREME COURT.  Delaware General Term, July, 1852.
*Mason, Crippen* and *Shankland,* Justices.

## THE PEOPLE *vs.* JOHN M. THURSTON.

Form of a writ of *certiorari* to remove a cause from the Oyer and Terminer to the Supreme Court, after verdict and before sentence, pursuant to 2 *R. S.* 736, § 27, and of the certificate on which the same may be allowed under § 23.

Form of an order for summoning additional jurors under 2 *R. S.* 417, § 41.

After pleading not guilty to an indictment for murder, and before the empanneling of a jury, an objection was made in behalf of the prisoner, that the caption of the indictment erroneously described Israel S. Hoyt, one of the justices who held the court at which the indictment was found, as "*one of the Justices of the Peace in and for the county of Tioga,*" and that by the constitution and laws of this state, a justice of the peace was a town and not a county officer, but the objection was overruled by the Oyer and Terminer.

Where a justice of the Supreme Court had made an order for summoning 24 additional jurors, and after the drawing of the first 36 jurors, and before the drawing of the additional 24 jurors, the old jury list had been destroyed, as required by law, and a new jury list had been substituted, and it happened that one of the 24 persons last drawn had been previously drawn as one of the 36 jurors, so that in fact only 23 additional jurors had been drawn, on challenge to the array for that cause, the challenge was overruled by the Oyer and Terminer.

On the trial of an indictment for murder, a witness called in behalf of the the prisoner, testified on the cross-examination that the prisoner became attached to a lady while she was staying at the house of his father, and that she became pregnant at that time and during her stay there, it was held incompetent for the prosecution to prove further by the witness that the witness knew the prisoner was charged with the seduction, and that the witness heard of it within a few days after the young lady left; and where such evidence had been admitted at the Oyer and Terminer, a new trial was granted.

On a trial involving an inquiry as to the sanity of a prisoner, a medical witness can not be permitted to give his opinion on the case, or on the question of guilt, but only on the question of sanity.  Per SHANKLAND, J.

Nor can a medical witness be permitted to give his opinion on the prisoner's sanity, where he has heard only part of the evidence on the subject, and his opinion has been formed on such part of the evidence.  Per SHANKLAND, J.

A medical witness may give his opinion on a hypothetical statement of facts and it will be for the jury to judge whether the supposed facts so stated correspond with the facts as proved.(a)  Per SHANKLAND, J.

(a) See Lake v. The People, (1 *Park. Cr. Rep.* 495,) since affirmed by the Court of Appeals.

The People *v.* Thurston.

*Opinions of eminent medical witnesses upon the subject of insanity, with their statements of the symptoms and evidences of insanity, and of the causes which produce it.(a)*

This cause was brought up to this court by a writ of *certiorari,* which was as follows:

The People of the State of New York:

[L. S.]    *To the Court of Oyer and Terminer, in and for our county of Tioga,* GREETING:

We having been informed that John Metcalf Thurston, of said county, was lately in the said court tried and convicted of the crime of murder, upon an indictment thereinbefore found against the said John Metcalf Thurston, and that upon the said trial of the said indictment, exceptions to certain decisions of said court were made by the said John Metcalf Thurston, and a bill of said exceptions has been settled, signed and sealed by the persons composing said court, and filed with the clerk of the said court, and we being willing, for certain reasons, that the said indictment and bill of exceptions and other proceedings thereon, remaining in the said court, should be certified by the said court to (and removed into) our Supreme Court, do hereby command you, that you do certify and return without delay, said indictment and bill of exceptions and other proceedings thereon into our said Supreme Court, so that the said Supreme Court may act thereon, as of right and according to law ought to be done.

Witness, Levinus Monson, Esq., one of the justices of the Supreme Court , at the Court House, in the village of Owego,

(a) The defence in this case was insanity. It has been thought necessary to a proper understanding of the questions involved, to report the testimony at length, that all the facts may appear upon which the medical opinions were based. The case is one of interest to both the legal and medical professions, and the evidence is of great value as a contribution to the science of medical jurisprudence. Among the distinguished physicians examined, whose testimony is given at length upon the subject of insanity, and who spoke of it in its various phases and varieties, were Doctor Nathan D. Benedict, physician and superintedent of the New York State Lunatic Asylum at Utica, Doctor John S. Butler, physician and superintendent of the Connecticut Retreat for the Insane at Hartford, and Doctor Charles H. Nichols, physician to the Bloomingdale Asylum for the Insane.

and county of Tioga, on this twentieth day of October, in the year of our Lord one thousand eight hundred and fifty-one.

M. STEVENS, *Clerk.*

A. MUNGER, *District Attorney of the county of Tioga.*

Endorsed. The within writ of *certiorari* allowed. LEVINUS MONSON, Justice Supreme Court. Filed Dec. 12th, 1851. To which was annexed a return as follows:
m

To the Supreme Court of the State of New York:

The return to this writ appears by the schedule thereto attached, containing a transcript of the indictment, bill of exceptions, certificate staying judgment, and other proceedings thereon.

The answer of the judges of the court of Oyer and Terminer, of the county of Tioga. January 2, 1852.

[L. S.]  MOSES STEVENS, *Clerk*
*of said court of Oyer and Terminer.*

The first count of the indictment was as follows:

At a court of Oyer and Terminer, held at the Court House in the village of Owego, in and for the county of Tioga, on the second Monday of April, in the year of our Lord one thousand eight hundred and fifty-one.

*Present*—Hon. William H. Shankland, a justice of the Supreme Court, presiding justice of said court, and Charles P. Avery, Esq., county judge of said county, and Israel S. Hoyt, a justice of the peace in and for said county, designated as members of the Court of Sessions in and for said county. The jurors of the people of the State of New York, in and for the body of the county of Tioga, to wit: Horace Giles, foreman; William Slosson, Chester Dawson, Barlow Sandford, Charles Farnham, James Wheat, Louis P. Legg, George Truman, Franklin Smith, Jeremiah McMaster, Charles Ward, Ozias J. Slosson, Ambrose Townsend, James T. Schoonover, Charles Beers, Elias Richardson, Charles Bingham, John J. Sackett, Abel Dubois and Daily Dunham, good and lawful men of the said county of Tioga, being then and there duly sworn and charged to inquire

for the people of the State of New York, in and for the body of the county of Tioga, do upon their said oath present in manner and form following, that is to say:

*Tioga County, ss.*

The jurors of the people of the State of New York, in and for the body of the county of Tioga, upon their oath aforesaid, present—That John Metcalf Thurston, late of the town of Owego, in the county of Tioga, aforesaid, cabinet maker, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the seventh day of February, in the year of our Lord one thousand eight hundred and fifty-one, at the town of Owego in the county of Tioga, aforesaid, with force and arms in and upon one Anson Garrison, in the peace of God and the people of the State of New York, then and there being, feloniously, willfully and of his malice aforethought, did make an assault, and that he, the said John Metcalf Thurston, with a certain axe of the value of one dollar, which he, the said John Metcalf Thurston, in both of his hands then and there had or held, in and upon the head of him, the said Anson did strike, giving to the said Anson Garrison then and there with the axe aforesaid, in and upon the head of him, the said Anson Garrison, one mortal wound of the breadth of seven inches and of the depth of three inches, of which mortal wound he, the said Anson Garrison, then and there instantly died. And so the jurors aforesaid, upon their oath aforesaid, do say that the said John Metcalf Thurston, him the said Anson Garrison, in the manner and by the means aforesaid, then and there, feloniously, willfully, and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York and their dignity.

There were other counts in the indictment. The defendant pleaded not guilty. It appeared by the return that an order for summoning an additional number of jurors had been made, pursuant to statute, as follows:

*State of New York, Tioga Oyer and Terminer:*

It being my opinion that more than thirty-six petit jurors will be required at the next term of the court of Oyer and Terminer, appointed to be held at the Court House in Owego, in and for the county of Tioga, on the second Monday of October next. I do therefore order that twenty-four additional petit jurors be drawn, and summoned according to law, to attend the said term of the said court. Dated, August 6th, 1851.

W. H. SHANKLAND,
*One of the Justices of the Supreme Court.*

Which said order was served on and filed with the clerk of the county of Tioga, more than twenty days previous to the day appointed for the commencement of the said court of Oyer and Terminer.

The indictment was brought to trial on the second Monday of October, 1851, at the Tioga Oyer and Terminer, before Mr. Justice Monson, Avery, county judge, and Waldo and Hoyt, justices of the Sessions. The counsel for the said John M. Thurston raised an objection as follows, to wit: That the indictment recites that it was found at a court held by William H. Shankland, a justice of the Supreme Court, Charles P. Avery, county judge for the county of Tioga, and Israel S. Hoyt, *one of the justices of the peace in and for the county of Tioga,* &c. The objection is that there is no such officer as a justice of the peace in and for the county of Tioga, by the constitution or laws of this state, a justice of the peace being a town officer; and that the indictment thereby shows that the court at which the indictment was found had no jurisdiction. The court overruled the objection, to which decision the counsel for the prisoner then and thereupon excepted.

The counsel for the prisoner then interposed the following challenge:

The said John M. Thurston challenges the array of the panel, because he says that it being the opinion of William H. Shankland, one of the justices of the Supreme Court of the State of New York, that more than thirty-six petit jurors would be re-

quired at the present term of the court of Oyer and Terminer, held at the Court House in Owego, in and for the county of Tioga, he, the said justice, did on the 6th day of August, 1851, by an order under his hand, bearing date on that day, order and direct that twenty-four additional petit jurors be drawn and summoned according to law, to attend the said term of the said court of Oyer and Terminer; yet that twenty-four additional petit jurors were not drawn or summoned according to law, to attend the said term, but that Marshall Anderson, one of the jurors drawn under said order had before been drawn as one of the thirty-six jurors required by law, to be drawn to serve as jurors at said court, and was not an additional petit juror to said thirty-six jurors, but one of said thirty-six jurors, and but twenty-three additional jurors were drawn pursuant to said order of said justice. And this he is ready to verify; wherefore he prays judgment, that the panel may be quashed, &c.

To which the public prosecutor interposed the following answer:

*Tioga Oyer and Terminer.*

The People          And hereupon the people aforesaid, by Alan-
     *vs.*          son Munger, District Attorney of the county of
John M. Thurston.

Tioga aforesaid, answers the said challenge so made by the said John M. Thurston, and says, that after the drawing of the said thirty-six jurors, before mentioned, for the said court of Oyer and Terminer, in due and legal manner, the said order of the said Wm. H. Shankland, one of the justices of the Supreme Court, ordering and directing the drawing of twenty-four additional petit jurors to attend the said term of said court of Oyer and Terminer, was obtained, served and filed with the clerk of said county of Tioga; that after the time of drawing the said thirty-six jurors, and before the time for the drawing of the said twenty-four additional jurors, under and in pursuance of said order, a new return of jurors had been made by the proper town officers of the several towns in the said county of Tioga, as provided by statute, to the said clerk; that thereupon and before the time for drawing the said twenty-four additional jurors, the said county clerk had destroyed

The People *v.* Thurston.

(as he was required by law to do), the list of jurors or ballots from which the jurors to attend the court of Oyer and Terminer of said county had theretofore been drawn, and that the said twenty-four additional jurors, so required by said order, were drawn in manner and form directed by statute in such case made and provided, by the said clerk from and out of said new lists of jurors, so newly furnished to him, the said clerk as aforesaid, and that the full number of twenty-four additional jurors were drawn out of the proper lists or ballots, in pursuance of said order and in the manner provided by law, and the twenty-four jurors thus drawn, as last aforesaid, were duly summoned, which the people are ready to verify; wherefore they pray judgment that the said panel may not be quashed, &c.

A. MUNGER, <em>District Attorney.</em>

The prisoner's counsel replied as follows:

And the said John M. Thurston, protesting that the said answer and the matters therein contained, are not a sufficient answer in law to said challenge; replies to said answer that twenty-four additional jurors were not drawn, as required by said order, or in manner and form directed by the statute in such case made and provided, by the said clerk, and that the full number of twenty-four additional jurors were not drawn from and out of the proper lists or ballots, in pursuance of said order, or in the manner provided by law, but that one of the jurors of the twenty-four drawn, in pursuance of said order, was also one of the thirty-six petit jurors previously drawn for said term of said court of Oyer and Terminer, and was not an additional juror thereto, and that but twenty-three additional jurors were in fact drawn in pursuance of said order. And this he is ready to verify; wherefore, as before, he prays judgment that the panel may be quashed, &c.

The counsel for the defence called *Marshall Anderson,* the juror, who being duly sworn, testified: I reside in Candor; know no other man of that name in that town; I have lived there forty years; there might be another man of same name reside there for a short time, and I not know it.

*Cornelius Hover* was then called by counsel for defendant, and sworn and testified: I summoned a part of the jury, and summoned only one Marshall Anderson; I reside in Candor; should think no other could reside there without my knowing it.

*Moses Stevens,* clerk of Tioga county, being called by counsel for the people, testified: The panel from which the first thirty-six jurors for this court were drawn, was made three years ago; afterwards that list was destroyed and a new one made before the twenty-four additional jurors were drawn, and in drawing them Marshall Anderson, of Candor, who was one of the thirty-six, was again drawn.

The court overruled the challenge, and the counsel for the defendant then and there excepted to the decision.

The drawing of the jury was then commenced.

The jury being impanneled and sworn, the cause was then opened to the jury on the part of the people, and the district attorney called as a witness,

*Phebe Thurston,* who was duly sworn and testified as follows: I reside in Temple street in this village; have resided here about one year; my husband's name is James Thurston. We were married a year ago last September; my husband is a brother of defendant; have known defendant and his family since my marriage; knew some members of the family previously. Defendant is a married man; was married in November last; he commenced housekeeping in January or first of February last, shortly before the unfortunate occurrence; he resided on Ithaca street; I was at his house the evening of the occurrence; went there between six and seven. There were present at the time, defendant's mother, Mrs. Garrison and child, and defendant and wife. The child is about six years old, name Elizabeth; they called it Libby. My husband went with me to defendant's and left in a few moments; Mrs. Garrison and child, defendant and wife, were present when I arrived; defendant's mother came soon after I went in; Garrison arrived about eight P. M., or not far from that; I had been there a considerable time when he came; they were taking tea when I went in. Defendant

came into the room immediately after Garrison entered; he had left the room but a few minutes before he and Garrison entered. Garrison took a chair the first thing after he entered the room, and then took his child; can't tell whether any one handed him the chair; am not decided on that; he moved the chair before he sat down, and then reaching out his hand to the child, drew her toward him; thought he put her on his lap; but am not sure of it; he sat on the east side of the room, a few feet from the back door, and between the stove and door, his feet near one corner of the stove, his back towards the door and his feet towards the stove. Defendant went out at the back door into the shed while Garrison was seating himself; he did not stop in the room. Garrison spoke to the child as he entered the room, and said, " Libby Garrison, why do you cry," or, " what is the matter;" don't remember as he called her to him. The next I saw after defendant went out at the door was the blow; it hit on Garrison's head; the blow seemed to strike near the top of the head; did not see distinct enough to know with what it was given; heard the blow; saw but one blow given; only one; I think the child was sitting on Garrison's lap when I saw the blow; I saw nothing after the blow; left the house immediately; the child was screaming; I remember nothing after the blow; it was perhaps three or four minutes from the time defendant went out until I saw the blow; nothing said while he was out except that Garrison spoke to his child; no one changed position; defendant's wife was in the bedroom; the door was open between the kitchen and bedroom; Charles T. Bell lived in the other part of the house. Mrs. Garrison sat on the south side of the room, east side of the stove; between the stove and back window; defendant's mother sat upon the opposite side of the stove by my side; I sat on the south side of the building and on the west side of the stove, nearly facing Mrs. Garrison; the stove was a cooking stove; no one sat directly in front of the stove. Mrs. Garrison requested defendant to go and see her husband and see what he had decided to do about taking the child; they had expected him up there that

evening, but had about given up his coming; I understood that Garrison was coming up by the conversation between defendant and his sister; he did not come up as soon as expected.

*Cross-examined.*—The conversation about this was commenced soon after I went in; there was something said about his coming up; defendant advised his sister to let Garrison have the child; told her not to get excited; said there was no use of it; had better keep calm. It was said Garrison would not be happy with the child, and perhaps would return it. Something was said about putting the child to bed; defendant said that they had better not until they knew whether Garrison was coming; said if he came he would take the child even if it was in bed; he advised her to rest before she decided about it; before he gave this last advice, it was said it was so late he would not come; it was at her request that defendant went after him. In connection with the remark that Garrison would not come, defendant said Mrs. Garrison had better take a night's rest; she said she could not rest until she knew what he was going to do. After she requested him to go for Garrison, defendant went out; was gone some few minutes, can't tell how many. Defendant seemed calm and composed during the evening before the catastrophe; when they came in the room, I think Garrison came in ahead of the defendant; when defendant returned he told Mrs. Garrison that her husband was at the door and wanted the child; she either said she could not take the child to him, or, to force it from her; if he wanted the child he must come in; defendant returned to the door and they came in together; no conversation between Garrison and defendant after they came in; can't tell whether defendant pointed Garrison to a chair, or whether he took one without being shown. Defendant's wife had not been sitting down before she took her seat in the bedroom; she had brought a basket of apples from the woodhouse a moment before; defendant had been sitting in the southeast corner before he went after Garrison; I think I changed my seat after defendant went out and before they came in; I had been sitting in front of the stove on the north side of the room. Garrison removed the chair some distance before he sa

The People *v.* Thurston.

down; it was placed in front of the stove; it was the one I had been sitting in; he moved it towards his wife and child, and to where he was sitting when he was killed; don't know what defendant was doing when he was out at the back door.

*Direct resumed.*—I think none of us rose out of our seats after they came in until the blow was given; Garrison and his wife sat a short distance apart. I think there was something said before Garrison came, about defendant's having conversed with him that day; he said to his sister that she must be calm; that he had been calm all day, and she ought to be.

*Andrew J. Madan,* sworn: I resided in this village until July last; have resided in Owego for twenty-five years; knew Anson Garrison, and know defendant; saw both Garrison and defendant on the night of this occurrence; met Garrison on the sidewalk in front of defendant's house; I was walking towards the depot, he was going the other way; saw defendant just as I passed Garrison; he came out of the door of his house upon the stoop; he came on the stoop and saw Garrison, I suppose, and said, " I am glad you have come, I was just going over." Garrison went through the gate to the house; did not hear any thing said about his going in; did not see defendant beyond the stoop. This was a little past seven; I went to the depot, and in a short time afterwards, fifteen or twenty minutes, I heard of the killing.

*Jacob N. Smith,* sworn: I reside in Addison, Steuben county; I resided in Owego from the third of February, 1850, until about three weeks ago; knew Garrison and defendant; saw them on the night this affair happened at defendant's house. I heard the alarm that some one was murdered; I was opposite the Tioga House, near the Diamond store; I ran to the house, went to the front door; saw Mrs. Garrison standing opposite the door that leads to the hall, just inside of the front room; she had the child in her arms; went into the kitchen, saw defendant and his mother and another gentleman I did not know; saw defendant standing in the doorway leading from kitchen to bedroom; saw Garrison; he was sitting in a chair nearly in front of the stove, feet close to the stove, back towards the north,

head inclining towards the left shoulder, a little back; a candle was in the room; the gentleman asked him either how he came to do it, or what he did it for; think a stranger had his hand on defendant's arm; defendant said he could not help it; he abused his sister last night; said nothing else as I heard. I noticed Garrison's head; I saw the cut on the right side of his face; when I first went in, old Mrs. Thurston was on the left of Garrison; passed around behind him; while I was there a lady handed me an axe from the back door and said, " This is the axe he did it with." The axe was bloody and had hair on it; bloody on the side from the eye toward the edge.

*Cross-examined.*—I have not since learned the name of the stranger, but suppose it might have been Garland from what I have heard on the stand. Defendant was standing still in the act of buttoning up his overcoat when I went in; he passed out into the front room first; think the stranger did not pretend to hold him in custody.

*Edward J. Johnson,* sworn: I reside in the village, and have for eight years; knew Garrison and defendant; some acquainted with their families. At the time of this affair 1 resided nearly opposite defendant's; I was passing into the street; heard an unusual noise at defendant's house; listened and heard loud cries from a female; I turned and gave the alarm; passed across to Dearborn's and spoke to a man to go to Thurston's; told him some accident had happened at defendant's; saw some other men near by and told them the same, and ran for the house; I met defendant at the door in the entry; the first one I saw was Mrs. Garrison, she was crying and making exclamations that her brother had done an awful deed, that she could never forgive him; defendant then came to the door where I met him. Mr. Dearborn was by my side as we entered the front door; he asked defendant what was the matter; there was some answer given, can not give the precise words. Defendant rested his hand upon my shoulder and requested me to call in a justice of the peace, or some officer; that he wished to give himself up; he looked toward Dearborn and said, " he wished he would call in some of the neighbors." When he addressed himself to

Dearborn, he spoke kindly. I went for an officer; called Willard, the deputy sheriff; did not go into the kitchen until I returned; I then saw Garrison sitting in the chair.

*Cross-examined.*—When he spoke about having the neighbors called in, he spoke kindly, not excited, but exhausted; looked pale; saw his eyes, they were wild.

*Charles H. Hullaran,* sworn: I reside near Hollenback's brick yard; lived in Owego over two years; did not know Garrison previous to the affair; I had seen defendant a few nights before that; I was in Ogden's, the gunsmith's, across the street from defendant's when I heard the alarm; made haste to cross the road, and went in the kitchen; saw Garrison and others; I did not know defendant; he was doing nothing then; a moment after saw him take hold of Garrison's head and keep it right; still some women in the room; did not know who they were; they were betwixt old and young. I asked defendant who killed the man; he said it was himself; I remained eight or ten minutes; a number went in with me, and a number came in afterwards. Defendant held Garrison's head with one hand; one wound was all I noticed; when defendant said " he did it," I said " you have committed a bad deed;" he replied " he guessed not."

*Cross-examined.*—The head inclined over; he put his hand on the under side of the head and held it up.

*Isaac B. Ogden,* sworn: I reside in this village, and have for twenty-five years; I knew Garrison and defendant; I was in the street crossing from the Court House to Slosson's store, when I first heard of the affair; went immediately to defendant's house; saw defendant before I fairly entered the house; can't tell whether he was on the stoop or steps; I asked him what was the matter; he replied he supposed Garrison was dead; I asked how it happened; he said he struck him with an axe; said he wished me to go in and see to him and attend to him; I am a cabinet maker, also an undertaker; do not keep ready made coffins; make them to order; saw an axe which a lady handed through the back door of the kitchen; noticed its appearance; bloody, and hair upon the axe; did not notice how far the blood extended; did not notice who handed me the axe

*Cross-examined.*—Defendant appeared calm and cool; after he said he did the act, I noticed he appeared paler than usual.

*Samuel T. Garland,* sworn for people: I reside in this village, about half way between Court House and the depot, on Ithaca street; I was sitting in my bar-room when I heard the alarm; I went directly to defendant's, went rather quickly; a man by the name of Woolley gave the alarm to me; don't know where he is; is not about town to my knowledge; I first saw Mrs. Garrison; she stood in the front room with a small child in her arms; I passed into the kitchen; saw Garrison sitting in the chair, and defendant's mother was holding his head, with her hands under his head; noticed no moving of Garrison except a little muscular action of the face; defendant was in the kitchen; I said, " Met, what have you been doing?" he passed by and said he could not help it; that was all he said; he passed through the square room to the door; that was the last I saw of him; I saw the gash on Garrison's face; saw nothing else.

*Cross-examined.*—When I first went in, there was no one present except the family, as I saw; saw no one but what I knew; others came before I went away; there was quite a rush; as defendant passed off to the front of the house, looked white, and wild out of his eyes; he looked very pale, trembled; saw him put his hat on his head; his hand trembled some.

*John Bell,* sworn: My father's name is Charles Bell; I am twelve years old; my father lived in same house with defendant, last winter; he lived in south part; defendant did not own any axe last winter, as I know of; father owned one; he kept it for splitting wood: I used the axe to split kindling wood; used to split it at night, after school, every night; split it out by our woodshed; shed in the east and back side of the house; used to leave the axe in the corner of the shed when done using it; defendant used the axe to chop his wood: his wood was lying out at the back end of the little shed; he used to lay the axe sometimes by the stoop at our back door, and on the north side, and sometimes he would take it back to the shed, where we kept it; I don't know as I should know the axe; have not seen

it since this affair; (axe here presented to witness,) can't tell whether it is our axe or not.

*Cross-examined.*—Defendant split his own wood; had not been in the habit of splitting his own wood a great while; don't know what time in the evening he split his wood; don't know whether he always carried it back or not; defendant had not been there but a few days; it was carried back to the shed sometimes; can't tell how many times it was left in the stoop.

*Thomas I. Chatfield,* sworn: I reside in this village; (axe presented to witness.) I have had possession of the axe since the night of the murder; got it at defendant's house; it was covered with blood; fresh blood, and hair upon the bit of the axe; the hair and dry blood is still on the axe; it has since been at my store opposite the Tioga House; I took it at the request of the district attorney; it has since been wrapped in the paper in which it was wrapped when brought into court. Garrison was sitting in the chair when I was there.

*James Haviland,* sworn: I live in Canawana; last winter worked at Camp's foundry; knew Garrison, he worked in the same room; I then knew defendant; I saw him on the day Garrison died; saw him in the forenoon; was in the shop with Garrison; saw him first in the forenoon, quite early in the day. I should think he remained in the shop about two hours; he and Garrison were talking; defendant was there again that day, about four P. M.; remained a few minutes; when I first went into the shop defendant and Garrison were sitting by the stove close together, conversing; heard nothing that was said; they were talking very low; I heard defendant invite Garrison up to the house that evening; Garrison said he would go after he went home and got his supper; he was then washing up; this was in the afternoon.

*Cross-examined.*—I know that Garrison sent for defendant to come down and see him; he sent me at noon; I delivered my errand; I told Garrison I was not going to work in the afternoon; it was then he sent me up to have defendant come; Garrison wanted him to come right down. While they were conversing in the morning they conversed in rather a low tone;

heard no altercation between them in the afternoon; their conversation was friendly. I went away in the afternoon, when I returned defendant was there.

*Isaac Spaulding*, sworn: I live in Ridgberry, Pa.; lived in Owego last winter; west side of the park; I knew the night of Garrison's death; was in Diamond store, in the auction room opposite defendant's, when I heard the alarm. We went across the street in front of defendant's gate, and halted there; we then went into the front entrance, saw no one; then went into the front square room, then into the alley; at the end of the alley I met Mrs. Garrison; some words passed and I stepped into the kitchen; I then saw defendant, Wm. Livingston and Chauncey Woolley and two or three ladies; defendant had a candle in his hand; came towards the alley with the candle in his hand; he spoke and asked me if I would go after a physician; I said "there is no use for he is dead." He said, " I want you to go after a physician, for I suppose he is dead, I meant to do it." Nothing else was said; I started after a physician on Front street, for Nye; met him in front of the Tioga House; did not return; was within two feet of Garrison when in the kitchen; saw the gash in his head; saw nothing on the face at the time, it was so covered with blood. Woolley took hold of the head when he first went in; stood behind him.

*Cross-examined.*—William Livingston, Chauncey Woolley and two or three ladies I supposed to be of the family, were present when I first went in; no others present; can't tell who came next; I remained until others came in. Woolley went then with me; I saw Johnson come in as I was leaving the house; did not see Garland in the house; saw him at the door; saw a large company at the door; Livingston and Woolley did not come away with me; I reside thirty-six miles from here; left here the 13th of last month; defendant asked me if I would go for a physician; said he had killed him and meant to do it; can't say as to his paleness; did not notice that he was tremulous; said he was dead and wanted me to get a physician.

*Stephen A. Phelps*, sworn: I reside half a mile ~~~~ this village; was in the village on the evening of the death of

Garrison; was on the opposite side of the street at the auction; some persons came in to the auction and said there was a murder committed over at defendant's; went immediately to defendant's; went into the entry; from there to the first room of the house; from there into the kitchen; some two or three in the room where Garrison was, and perhaps as many more passed in with me; saw Mrs. Garrison at the gate; did not see defendant until I went back from the kitchen; then saw defendant in front entry; I asked him if he knew or could tell me who murdered Garrison; defendant said yes, "I am the man that did it, I killed him." Nothing else said.

*Cross-examined.*—The females had just left the house; I gave my attention to his appearance; he seemed melancholy or sad, did not see that he was excited; did not notice whether he was pale; did not notice his eyes; stood in a kind of studying posture; was in the entry.

*Sarah Hill*, sworn for people: Live on Ithaca street; next house to where defendant lived last winter; I heard of Garrison's death the night on which he was killed; I heard an outcry at defendant's; I was then in the yard back of our house, some twenty-feet, looking towards defendant's house; before I heard the noise, I saw him come to the door, open the door and come out into the shed back of his house; saw him stoop down; saw him go back into the house; the next I heard was a scream; it was instantly as he went in; it was a short time from the time he came out until I heard the scream; it was quite quick; I did not see him go out of the back shed; there were two open places in the side of the shed; one was a stove pipe hole, and I don't know what the other was for; the other was square. The stove pipe hole was west, and nearest our house, and was the highest from the ground. I stood on higher ground than the building; could not see into defendant's kitchen when the door was open; could only see the light.

*Cross-examined.*—It was the most light by moonlight; I stood by the back building in our yard.

*Frederick Nye*, sworn: I reside in this village; am a physi-

cian; know Garrison and defendant; was at defendant's house on the evening of the death of Garrison; examined his head; found one wound in the top of the head, or a little on the left side, and one in the face; the one in the left side of the head was an open wound five or six inches in length, and four inches in depth; opened some two inches; spread open; the other wound was upon the right of the head; the top of the wound commenced where the skin was broken, and lower jaw was fractured, though rather longer than the wound in the top of the head; it severed the jaw bone; done with a sharp instrument; the tendency of the wound was downwards and forwards; the first wound would have caused instant death. Garrison was sitting in the chair in an upright position when we examined him.

*Robbins D. Willard,* sworn: I reside in this village; am the deputy sheriff and jailer; have held the office two years next January; was in the Court House when I heard the alarm the night of the catastrophe; it was between seven and eight; Edward Johnson came and gave the alarm; I then went to defendant's house; saw Phelps first; I saw defendant; I was passing through the gate; Phelps gave me a jog and said, " there stands the murderer." I asked who, and he said, Thurston. Defendant was standing in the front entry, leaning against the door; I went on to the stoop, stepped by the side of defendant and spoke to him; don't remember what I said; he stood and looked me in the face and said, " It is Willard, is it?" he said he was ready to give himself up; think he said he had sent for me. When we got out into the yard, I asked defendant what was done; he said he had killed Garrison; he said, " I could not bear to hear the child scream." He had carried his left hand by his side till then; he swung it out and I noticed it was closed; asked him what he had in it; he said, nothing, that he held Garrison's head after he struck him with the axe, and his hand was bloody; I did notice it then. Just at that time we met Prentice Ransom; he wanted to know what was the matter; we were walking towards the Court House; I told Ransom that defendant had killed Garrison; he

. The People *v.* Thurston.

wanted me to let defendant go back with him, said he would be responsible for him; said, "can't you go back too?" that was to me. I said I thought we had better not go back; defendant told Ransom to go and see that every thing was provided for Garrison that was necessary, and after he had got through there to come over to the jail; we then came this way and Ransom went the other way. Think defendant said, "I did not think this would happen when I was at the furnace to-day to see Garrison;" said he had been down there to see if Garrison would not consent to let the sister keep the child, but he would not consent to do it; that he found that Garrison had better rights to the child than she had, and that the arrangement was made for him to come after the child that evening. Mrs. Garrison had concluded to give the child up without making any fuss about it, or feeling bad; when the child screamed, he came in from the door and struck him. He wished me to take him to a room where he could wash; I took him to the kitchen and he washed himself. Odell Gregory came; we were the only persons in the room; I then noticed his hand, it was bloody. After he got through, Gregory went out and I called in Eldridge; I went to arrange the cell and left defendant in care of Eldridge. Gregory asked him, "Why, Met, how did you come to do this crime?" As I understood it, the answer was, "that it was an old matter, and if he undertook to give a description it might leave bad impressions." I soon after put him in a cell alone. After the excitement was over and the people had gone away, his sister Nancy came to see him; she went to the cell and spoke to him; he spoke about having the Daily Tribune sent to him, and some books to read; it was not a request made to me. There was something said about the influence it would have upon his sister, Mrs. G., but the sentence was disconnected, and I can not remember.

*Cross-examined.*—I think Ransom asked him how he came to do it, and his answer was, "I could not help it."

The prosecution here rested, and the court adjourned to 8½ o'clock on Wednesday morning.

On the assembling of the court, the counsel for the prisoner

opened the defence and read from commissions duly executed, and made other proof of insanity in the family of the prisoner, to a greater or less degree, in the following relatives, to wit: Eunice Thurston, grandmother on father's side; Levi Thurston, uncle on father's side; one aunt not named; Esther Darling, grandmother on mother's side; Cornelius Metcalf, grand uncle on mother's side; Elias Fisher, great grand uncle on mother's side; Silas Metcalf, and Deborah Bennet, mother's cousins; Eunice Hudson, and Esther Knight, grand aunts on mother's side; Elizabeth Darling and Mary Darling, cousins. The counsel for the prisoner then called as a witness,

*William S. Weston,* who being duly sworn, testified as follows: I reside in Wisconsin; I knew the defendant, Thurston; have known him about nine years; worked with him nine years ago this last September; worked with him eleven months; boarded and slept with him a part of the time; I think about two months; he was in the habit of a certain vicious practice, known as masturbation; couldn't say how frequently; knew of it several times; have no recollection of his telling me how often he did it; the practice extended through the whole of two months, frequently; don't know of his practicing it when I did not sleep with him.

*Cross-examined.*—I have not slept with him in the last nine years; my attention was recalled to this subject within the last two weeks; had not thought much about it before for a number of years; I came from Wisconsin on purpose to attend this trial; was written to and replied; I have no recollection how many times he indulged in the practice, nor how many times in a week; I think as often as every week; don't remember certainly how often; I spoke to him about it once or twice; he was in the same bed with me; I am the oldest; don't know how much older; I am thirty-six; he was engaged in cabinet work; I was journeyman for him; he worked, himself, though not as steady as his hands; he had one besides myself part of the time; he had no more than two at any one time. I never mentioned this subject to any body else; Mr. James Thurston wrote to me to come down.

*James Fisher*, sworn: I reside in Owego; know Thurston, the defendant; have worked for him about a year; commenced two years ago this fall; I slept with him from four to six months; knew about his being addicted to masturbation; when I first slept with him I should think as often as once a day; as often as once in twenty-four hours; I spoke to him about it; told him he would ruin himself if he kept on in that practice; he didn't practice it so much after that; I left off working for him about a week before his arrest. He appeared to be a very passionate man, and downhearted, if things didn't go to suit him; when they did go to suit him he was cheerful and as clever a man as I ever had any thing to do with; when in good humor he was full of jokes and wide awake; he treated me kindly; he had spells of low spirits, sometimes as often as two or three weeks, at other times six weeks or two months, and then he would have a blowing up of his hands, or something of that kind, perhaps discharge one. Sometimes these fits would not last more than a day, sometimes three or four days or a week; sometimes he worked some during these turns, and generally managed his business; didn't work much in his shop; was around doing business; we boys in the shop used to call these turns " lovesick scrapes," or " bulling scrapes," sometimes we called them something else. I could tell when they were coming on; don't know as he knew when they were coming on; he didn't say any thing on the subject; I never noticed his wandering about; have known of his retiring to bed in the day time, positive of only twice; once a year ago this fall, and once before that; he said he was unwell and had the headache. I know nothing as to his costiveness; his habits of eating were irregular; was particular how a thing was cooked; I have not known him to go without eating over two meals; these irregularities were quite frequent; sometimes he would eat very little, not so much as a man ought to; I have heard him speak of having water poured on his head; I remember the matter between him and a journeyman concerning some rocking chairs. He came into the shop and commenced crying, saying he expected to have forty or fifty dollars' worth of chairs done, but

now they were all spoilt; after that he said the reason he cried was because the journeyman spoke cross to him; I heard him say nothing about the journeyman loving him.

*Cross-examined.*—My age is twenty-one; I boarded at his mother's; Thurston also boarded there; I slept with him nearly all the time I boarded there, in the same bed with him; my attention was called to this subject since that period, some four or six weeks ago by James Thurston; I can not describe his turns of depression in any other way than that he had his fits; his conduct was rather sulky, his disposition angry; he talked loud in a scolding way, and pouted; he discharged me because he thought I charged him too much.

*Jane Beers,* sworn: I reside in this village; my husband's name is William P. Beers; I and my husband boarded four months with defendant's mother; we commenced the first of March, 1850; defendant was very irregular in eating; at times he would go without eating two or three meals; when he did eat, he ate very hearty; at times he was very gloomy and very much cast down; these turns would last him sometimes a week, sometimes a fortnight, and sometimes longer; these spells came upon him perhaps once in six weeks, and perhaps once in four weeks, can't say exactly; at times when he had these turns he was very cross in the house; complained of a headache; would not talk much; would stand around and do nothing; have seen him stand an hour at a time and perhaps longer; would stand in his shop door and by the fence, near the shop; don't recollect that he spoke while standing; did not have company; he spent some time in the house during the spells; he lay down sometimes on the lounge in the day time with his hands up to his face; lay there perhaps an hour with his face down; complained of headache.

*Cross-examined.*—My husband's business is a cabinet maker; he worked for defendant when we boarded at his mother's; commenced work for defendant the third week in February and continued for about three months; during this time we boarded at defendant's mother's; and one month after husband ceased working for defendant; when defendant went without his meals

he complained of a headache; never knew him to go without his meals except he complained of the headache; don't know how long after we left that he was married; don't know that he was visiting a young lady at the time; did not know defendant's wife before her marriage; have seen her, but not acquainted with her; she lived in defendant's house where defendant afterwards lived; she lived with her sister; her sister's name was Mrs. Willey; defendant's mother lived a few steps from where his wife lived with her sister, on the same side of the street, and where defendant's shop was; I never conversed with defendant about his visiting the lady he afterwards married; don't know anything about it except hearsay; have seen him go in; don't know how long he tarried; I have set at my window an hour and perhaps two hours at a time, tending baby, one at a time; my own; I mentioned the circumstance of seeing defendant stand so to my husband about the time; the habits of defendant were first spoken of to me by my husband; can't tell when.

*William P. Beers*, sworn, says: I am the husband of the lady who has just left the stand; I worked for defendant and boarded with his mother; worked for him about three months; boarded at his mother's during that time; his spirits at times were low; they were sometimes longer and sometimes shorter; sometimes a week and sometimes not as long; he did not much of anything during these times; he was low spirited and did not attend to his usual business; don't know as they were regular; there was remarks made about their regularity in the shop; he very often complained of headache, and would then neglect his business generally; spent his time sometimes in the shop and sometimes in the house; used to lay down in the shop on the bench; this was during his low depression; he did'nt know much about his business, or do much about it at those times; I don't know of any cause which produced the turns; nothing in his business to produce them; was somewhat acquainted with the state of his business; could not get him to speak of his business so as to get any information; in these times his habits of eating were very irregular — he would go a

whole day without eating; his habits about eating at other times were good — when he did eat saw nothing irregular about his eating; I conversed with my wife on the subject of his peculiarities at the time.

*Cross-examined.*—Never worked for him except these three months; came into this town a year ago last February; went to work for him when I first came; three worked with him besides myself — all working by the piece; this is the usual course of working at cabinet work; I have not been spoken to with a view of being a witness as I know of; Camp spoke to me about it; I told my wife I had seen Camp and we had a talk about this matter; defendant had one of these depressions about the second week after I went there; complained of the headache at this time; can't state how long that lasted; can't tell any particular time when he had the next; can't tell how many he had while I lived there; had more than one but can't tell how many; can't say that it is more than twice; don't know that I ever witnessed any of these turns except when he complained of the headache; have seen him on the bench more than once; can't designate any number of times; sometimes he would get up and go out; never knew him to get up and go to work; he worked most of the time except when he was complaining; was a good workman; worked more than common fast when he was well; did not work at the best work himself; had his hands work on as good work as he did; he sold furniture; what I saw him sell he sold at a fair price; bought materials for furniture; knew nothing except by report that he was visiting a young lady; was not married when I left his mother's house; can't tell how long after.

*John Tillotson,* sworn: I commenced work for defendant the last of March or first of April, 1847; was there until the last of July, 1847; I boarded at home during the time; I afterwards worked there again; came in year 1849 and worked until April 1849; I went there again in September 1850 and quit about a week before this occurrence; during the first time I was there defendant appeared to be low spirited; did not do anything to amount to anything, till just before I left he went

to repairing his house; they lasted pretty much all the time I was there; the first time he did not work in the shop over two weeks while I was there; was more cheerful at some times than at others, but did not work; sometimes he was in the shop and sometimes in the street, and sometimes he would go off and be gone for a day when I did not know where he was gone; when he was in the shop he appeared dull and lazy like; I told him he was lazy; complained of a pain in his head sometimes; used to wet his head in cold water; this was all I ever saw him do for it; sometimes he would set on the saw bench and hold his head, sometimes he would lay on it; would rest sometimes an hour and a half at a time, holding his head; held it with both hands; when lying down on the bench he would lay on his back with his face up; don't recollect of seeing him lie so but once; have seen him set so a number of times; can't tell how many; his habits of conversation were pleasant; conversed about the same as usual; did not give usual directions about work without he was asked, then sometimes he would not; would tell me to do it as I was a mind to; never saw any person have just such turns as he had; the second time I went there he worked more in the shop than the first; saw something of these turns but not as often as the first; can't tell how often I saw him sit holding his head with his hands; was there three months; this turn lasted about a week — the last, three; did not complain of any ailment; was about the shop not doing much of any thing; he was not in the shop much of the time; the last time was about his house, fixing it; don't recollect that he was lying down any of the time; knew nothing about his costiveness except what he said — he said he had not been out for a week; he made this complaint several times while I was there at the different times; I know he and Garrison were on good terms of friendship; have heard defendant speak highly of Garrison; should think from his manner of speaking of him that they were more than common friends.

*Cross-examined.*—Defendant was some two weeks preparing for housekeeping. I worked for him when he was married; he

was married on the 25th of October. Think he bought the place about a year and a half before, in 1849; I think he paid $900; told me so at the time. Some one else lived in the house when he bought; he took possession of his house the first of March before his marriage; when he took possession he prepared it for two families; I was living with him then; he fixed up the house and rented it for a year; don't know how long he worked at his house when preparing it for two families; after he was married he was about his shop and seemed to be cheerful and attentive to his business. He did not get to house-keeping till after I left; was laying a new floor and altering partitions about his house; used to see him days when I was there; I saw him on Monday before this transaction happened, and after I left; he was in the shop at work; he appeared rational as he usually is. This was the last I saw of him until I saw him in court.

*John S. Barber*, sworn: I reside in Coventry, Chenango county; I lived here six years ago this fall; worked for J. M. Thurston some time, from three to six months; I think I boarded with his mother most if not all of the time; slept with him a part of the time; I think most of the time; I know of his indulging in a certain practice called masturbation; I should think he indulged as often as every night, or oftener; it was the cause of my not sleeping with him any longer; he continued it as long as I slept with him.

*Cross-examined.*—I should think I lived with him about a month after I refused to sleep with him; I would not be positive about his indulgence every night, but it was nearly every night. I should not like to state positively that it was as often as twice a week nor once a week, nor once a month, but I remember that he practiced it as a general thing; I don't wish to change from what I first stated, it is as far as my memory serves me.

*Fanny Ransom*, sworn: I am the wife of Prentice Ransom, sister of defendant, and live in this village. I have known peculiar conduct and habits in my brother; about seven years ago he became inattentive to his business, wandered about,

The People *v.* Thurston.

took long walks, spent nearly the whole day, was absent from dinner sometimes, came in late in the  afternoon and asked me for a cold dinner, saying he had been walking; this peculiarity of conduct continued a number of months, perhaps a year; I recollect, at least during cold and warm weather, his conduct was the subject of family remark; his inattention to business caused anxiety, and we often spoke of it in the family; his irregularity in eating, sometimes going almost entirely without, at other times eating excessively, was also a subject of anxiety. I did not know what was the matter with him; after a time we saw that his countenance was pale, and we discovered that he had the piles and was constipated.  He seemed sad and appeared friendless; I do not recollect any thing about his eyes at this period, only a general sadness; he was careless in his dress; disregarded his appearance; was not cleanly as formerly; would go ragged sometimes.  After this turn of about a year, there was a change again, he became excessively industrious; would work very late at night and very hard; so much so that he again occasioned anxiety.  At this period sometimes he seemed excessively fond of dress, at others perfectly indifferent; sometimes he would get a great deal of clothing on hand, at other times he would be so destitute of some articles that he would have to borrow of his brothers; he would speak of getting a suit or a garment and talk of it so much that we would feel disgusted and think he was silly; he would give large prices sometimes for putting extra work upon garments.  From the time of returning to his business, about six years ago, his habits have been very irregular; sometimes he would be very industrious, and then he would be the reverse, and irregular also as to food; I don't recollect the length of the intervals between these spells of inattention to business; there was a time three or four years ago also, when he was very irregular; I think for months, or at any rate a considerable long period; we were very anxious about it.  During the first part of the six years I know these spells were occasional, but later than that they have been more frequent, quite frequent, during this last year as often as from three to four weeks; I know they

were very frequent; I could not tell the exact time. These spells were worse toward the latter part of the time, and continued to increase in violence up to the time of his arrest; they usually continued from two to five days; sometimes I have known them to last a week; they seemed to be of longer continuance as time advanced. The general character of these spells was that he was sometimes very pale, and at other times his face would be very much flushed, much colored. He would say, when asked what was the matter, that he had a distress in his head, a bad feeling in his head during the last two years. He had the piles, was constipated, was subject to a loss of appetite; at other times he had an excessive appetite; sometimes he would come in, lie down on the carpet, clasp his hands over his head, at other times he would clasp his hands behind his head; at other times, placing his head on his knees, he would clasp them over his forehead; sometimes he refused to talk, could not converse, did not wish to hear conversation; sometimes he was silent several hours; at one time, lying on the carpet, he was silent a long time; sometimes he would come in and speak but a few times during an evening or an afternoon. I have known him to eat enough for two or three men when he said he was sick; he was always, during these ill turns, afflicted with diarrhea; this diarrhea followed the period of constipation. I have said he was often silent; at other times excessively talkative, talked a great deal upon little things, and would talk upon them until he seemed very silly indeed. As a general thing, he was in my house almost every day; I gave him medicines for these indispositions; he sometimes asked me to press his head; at one time he asked me to pour cold water on his head. During the last year or two his eyes were very wild, very glaring at times; and the last year a few times they were blood-shotten. During the last winter I noticed similar turns and very severe; the last one I remember was in the early part of January last, I met him in the street, he was deathly pale, his eyes were very wild, I asked him what was the matter, he told me he had that dreadful feeling in his head, and asked me if I would go home and give him some medicine; I told him I would go very soon,

and did go, but he did not come. I had a case of homœopathic medicine and gave it out to members of my family. I should think I saw him next at father's house, three or four days after; I went to see him but he was not in; I think it was the next day after I met him in the street; I went again the day after that, but I don't recollect whether I went there to see him or on other business, but I did not see him then. I went again some days after, and found him in bed throwing himself from one side to the other; he had drawn the bed and pillows into the center of the bedstead, and was tossing himself about; I asked him what was the matter, he replied, this dreadful distress in my head. I found his face very high colored and his pulse very quick; the cords of his neck were very much enlarged; he said he could not lie still, he was in so much distress. I pulled up the feathers as well as I could; drew him to the foreside of the bed and held him with one hand and made passes over his head, as he often wished me, with my other hand; his general habits of sleep I knew little of; he would sometimes say he did not sleep; I gave him medicine for his head; I thought the blood was rushing to his brain; I attempted to relieve no other difficulty except that of his head; his eyes at this time were dreadfully wild, bloody and red, and very large; he glared them in my face until I was horrified; I said he was a crazy man; I told my mother, I think, or at least my husband, when I got home, that he was crazy; this was in the early part of last January; I saw but little of him after this; I saw him at my father's house the day of the occurrence which has brought him here, between four and five o'clock; my mother, Mrs. Garrison and my brother's wife were present, and I think the little child was in the house. My brother and Garrison were on the most intimate terms always; their friendship had existed for many years, before the marriage of my sister and ever since; there was a conversation on that day between him and Garrison; he had been to see Garrison; don't recollect of his saying what Garrison did say; he told his sister that she must let Garrison have the child and must not resist him; he thought as the child had come in the morning she would be

inclined to come again, and the father would allow her to do so; he said the law would give the father the child, and that the father loved the child as well as she did; a short time before my sister left her home he was at our house and invited me to come and see him; he said he had the happiest home of any of us, and wanted we should come there and see how nicely they were living; he was very pale the day of the fatal occurrence, and his eyes were very wild; he complained of having to be up late in drying the plastering of his house, and not having slept; I don't think he had been well for weeks; when any one spoke in unfriendly terms of Garrison, he always said he felt that Garrison meant to do right.

*Cross-examined.*—I have been married twenty-one years; I have living four children; have kept house on Main street in this village, since two or three weeks after my marriage, only a short distance from my father's house; John's wife has had a child; a mature living child, but not now living; I have not studied the subject of insanity; have read no books on the subject; have had conversation with my mother about my brother's singular appearance two or three times; since the catastrophe, I have spoken with Mr. Camp upon the subject, though but once I think; I was at my father's house during the last two or three years, two, or three, or four times a week, and remained sometimes an afternoon or an evening, or an hour or two in the morning; I did not always see my brother; he was at my house very often; sometimes he would come every day, sometimes two or three times a day, then again not in some time; after he purchased his house he made some alterations and rented it; I think he superintended these alterations; I never remained any time in his shop; there were circumstances connected with our own business that made me know he worked hard; I don't know personally that he worked late; there was an occurrence, I know, about that time that troubled him; there was a person here whom he professed some attachment for during the last part of the year that he neglected his business; it was the very last of the year; I think a paleness like his is very uncommon; I do not know that paleness is a

common symptom of headache; I know but little of other people's diseases; it was the week he commenced house-keeping that he invited me to come to his house; he commenced house-keeping on Monday and this occurrence was on Friday; it was at my father's house that our family were assembled; I was there the most of the afternoon up to five o'clock; had heard of my sister's leaving her house before I went — the next morning I think after she left; I did not see her I think before I met her at my father's; the interview of John with the rest of the family that day was short; he spoke of having seen Garrison that day; he did not state in my hearing what was the result of the interview between him and Garrison; he said that the father was entitled to the custody of the child; I don't think I heard him say he had held any legal consultation on that subject; he told her she must bear her trouble patiently; she seemed at times to vacillate about returning to her husband; she did not tell me her difficulties; she was quite anxious to have the custody of the child and thought she could not give her up to her husband; my brother left the house before I did; he staid only a few minutes; I understood that Mr. Garrison was to come that night and see about the child; they did not know what he would do about it; John did not complain of a headache that day in my hearing; I noticed he was very pale as he passed the window and as he came in at the door; he could not have come from Mr. Garrison's then because he came from another direction; my brother never told me that he would at some future time give me the detailed reasons for killing Garrison — no sir, never; he said he wished he could tell me his whole heart and how he felt.

*Prentice Ransom,* sworn: I am the husband of the lady who has just been sworn; I have heard her testimony; my wife spoke to me the fore part of last January on the subject of defendant being deranged; I saw him the same evening; when I called to accompany my wife home I went into his room; he was rather quiet when I saw him; was said to be better.

*Miss Nancy Thurston,* sworn, says: I am the sister of the defendant; I was at home in 1845; have been absent one year

since then in 1847; have not been absent since that time longer than two months; for the last two and a half years have been at home all the time; I have seen much of the defendant while I have been here; in 1845 he was very unlike my other brothers, and very unlike his former habits of business, and was not well; was inattentive; was negligent in regard to dress, so much so that it worried me; at other times was very extravagant; these spells lasted some months; we were afraid he was going to relapse into his former habits of inattention to business; in 1845 he was so negligent that we were afraid he would not sustain himself in business; this lasted about a year; he would sometimes be gone from home; could not find him for half a day and sometimes for all day; have gone to his shop myself with persons who wanted to see his furniture; there were periods that year that he worked, and when he did work he worked immoderately; we found that he was out of health, that induced a charitable feeling towards him; it was a matter of family concern; we talked about it frequently; he complained of a headache, diarrhea and costiveness; sometimes his face was red; sometimes a dark red; and other times he was very pale, almost a lead color; complained of distress and agony in his head; I combed his head frequently; sometimes appeared to be a fullness in his head; he would put his hand to his head; he was very sad indeed; this melancholy appearance was the first to draw my attention to his health; his habits of eating were irregular; I know of his going without his breakfast and dinner; know of his forgetting that he had not had his breakfast; thought he had had it, so negligent was he of his food; at other times he would eat excessively; I know that he was troubled in his sleep; wished to sleep below; used to walk late evenings; wished me to walk with him after the usual hour of retiring, because he could not sleep; noticed a wild appearance; two or three years ago he had a like spell, then complained of his head, with constipation, piles, and diarrhea; this rested upon him, certainly two months, perhaps more; his spirits were very much depressed; it was very painful to see him so much depressed; would not

The People *v.* Thurston.

talk much; is usually communicative; then again would be extremely talkative; subjects, trifling, such as modes of dressing, combing hair; he would come into the house and lie down on the carpet, and put his hands on his head; sometimes on the fore part and then on the back part; complained of agony in his head; I used to tell him to go to bed; disliked to have him lie on the carpet; told him if he was sick to go to bed and make a business of it; used to bathe his head; when reading, have heard him complain of the blending of the letters; said the letters all run together; said this when reading to me; at times he was restless, indisposed to sleep; two nights I knew of his leaving his room after he had retired; heard the door and supposed it was him; went to his room and found he was out; kept a light burning; after a while he returned; said he could not sleep; wished to lie on the settee; he slept there all night; on another morning when I arose, found him on the settee; also found him setting up one night in his room; said he could not sleep; habits of eating irregular; absent from his meals; used to keep his victuals for him; he would come in after breakfast, and I ask him if he did not want his breakfast, he said he had had his breakfast, I said he had not and I had saved some for him; after his spells of fasting he ate excessively; would come in between meals for something to eat; since 1845 his spells of depression were frequent; generally these fits of depression visited him once in four or five weeks; they rested upon him sometimes a week, sometimes shorter than a week; sometimes his face and eyes would be red and sometimes a deathly paleness; agony in his head; sometimes he would say if I knew how he felt I would not scold him; complained of costiveness, diarrhea and piles, spirits gloomy, habits of sleep as I have described; do not know the particulars so much as at the other times; I knew of a spell a few weeks before this occurrence; I saw him all the week the first part of January; he was depressed the fore part of January; I was home spending an evening, and he did not come in; mother said he was in his room; I went there and said, why are you

so unsocial; he looked wretched; said he had a bad feeling in his head; told him he should banish these feelings as much as possible and be cheerful, that another's happiness now depended on him; said he could not help it; his look was strange; holding his head, his arms resting upon his knees; he wept and said he would go to bed if I would go and leave him; I did so; defendant and Garrison were very friendly, unusually so; it was unbroken; never saw a more constant friendship than theirs; defendant would say we were wrong if we ever spoke against Garrison; said he had a good heart; said he worked hot iron so much that it combined with his nature; that his nature had blended with the iron and he was not to blame for his iron-like manner; never heard defendant speak in any unkindness of Garrison; he was not well just before this catastrophe; had the diarrhea; was depressed; was repairing his house; had newly plastered it; had been there three or four nights keeping fires to dry the plaster; he moved in before the plaster was dry; said he kept up fires after he moved in; had been up the week before; told me how cold the nights were; he went home with me a short time before this; I lived at Ransom's; Garrison lived four or five houses beyond Ransom's; defendant's wife was at Garrison's; he was going after her; this was his principal business; he had agreed to go after her; after he reached Ransom's and I had passed through the gate, he turned around and started back towards home, and went in the opposite direction from Garrison's; went as far as Dr. Frank's; I then called on him and said have you forgotten your wife? he then said, I had forgotten I had a wife; he then turned around and went after her.

*Cross-examined.*—I have not generally resided at home; my home has been with Mrs. Ransom since I was a child, and have not resided in this village all the time; have been absent a good deal; never have been absent but two years; one year at a time; one year before and one year since 1845; have been from the village a good deal teaching; have taught at different distances from the village; one year in Oswego county, and one year in North Carolina; was also in Elmira a term and a

half. I have been at home for the last two and a half years; have always spent much time at my father's; during these years defendant has been in business; in 1845 he worked occasionally; I was at home and at father's; he worked less than half the time; I saw him every day unless he was absent; the last part of the year he became unluckily attached to a lady; she was a daughter of my mother's half brother; she was a stranger; stayed at my father's house while here; was there from autumn until winter; went directly home, I supposed; don't know that she became pregnant while here; never have learned that; it was reported so; that is all I know about it; knew nothing of it when she left; never suspected it.

*Question.*—Did you not know that the defendant was charged with it?

(Objected to by defendant's counsel — admitted and exception taken.)

*Answer.*—I did not know it when she went away.

*Question.*—How long was it after she left before you had any information about it?

(Objected to and exception taken.)

*Answer.*—I heard of it within a few days.

She lived in New England; I don't know that she went to Deposit, on the Delaware; heard of her marriage soon after she left; don't know when she was married; don't know that she was married at Deposit, to whom she was married, nor what countryman he was; can't tell what year she was married; he had been depressed the whole of that year before she left, and afterwards; appeared better after he returned from down the river; went down in March with Ransom; carried on his business; he was irregular from that time until he had the two months' illness, two years ago; nothing occurred to him then; no love matter that I know of; never knew that he addressed a young lady who received his addresses for a while; he spoke kindly of Garrison when others reproached him; they read a great deal together; a year ago last winter he was at home; can't say when he began repairing his house; he did not commence repairing his house before his marriage;

there was a family in his house and they left in January; he was anxious to get to housekeeping; very busy about his house; used to stay very late evenings; I was in his house two evenings, between nine and ten o'clock; knew that he had been working too much; knew that he had been to see Garrison on the 27th of February; told me in the morning that he was going to see him; saw him at noon; told me that he had an interview with Garrison, and that my sister could not have the child; said, perhaps he could reason Garrison out of the notion of keeping the child, it was so opposed to nature to keep the child away from its mother, said he would see Mr. Parker; at noon said he had seen Mr. Parker, and Garrison had a legal right to the child; told his sister that she must give up the child, that Garrison would see that he could not bring it up. Do not know as he said anything about her returning to her husband; did not mingle much in society; never knew of his omitting to take his meals except when he was unwell; when he recovered he eat more than usual; was soon satisfied.

*Direct resumed.*—The female to whom he became attached came here in the latter part of the year of the depression; she came in the fall. His depression commenced in the winter or spring before; commenced a number of months before she came. Defendant brought a beggar boy home with him soon after the fire in Owego; it was in the evening, we had been to tea; wanted me to give him some supper and bathe his feet; said the boy must sleep in his bed; said he would go down to Ransom's to sleep; he went out and I supposed had gone, but he soon returned and wanted me to go down to Ransom's and stay; I told him I would not; he then went out again.

*Cross-examined.*—When he came home he said he had a candidate for me in the kitchen. The boy was very ragged; had a very sore foot, so much so that we could hardly get his boot off.

*Cornelius Williams,* sworn, says: I live about three miles from this village, in this town. I know defendant; went to his shop April 8th, 1850, to buy furniture; his appearance was

wild, his eyes looked large; never saw him look so before; he turned round and round a number of times; I left the shop; I felt afraid; I thought something ailed him. I said after I got home, that he was either crazy or had been drinking; never knew that he drank. Never saw any person's eyes glare as his did; I went over to Ogden's shop. (It was conceded by the prosecution that the prisoner had always been strictly temperate.)

*Cross-examined.*—I was born here; I have lived here ever since; am twenty-nine years of age. Wanted to buy chairs, four Windsor chairs; went back and bought the chairs. The same day, two hours after that, he seemed to be quite well; no one else in the wareroom while I was there; was not angry; I found him in the back shop; don't know how many there w re with him; I called him; can't tell what was the matter; did not notice it when he first came out. I told him I wanted to buy some chairs; he named a higher price than I gave; can't tell what I said. I went to another shop to see if I could not get them any cheaper, found them about the same; went back two hours afterwards; can't tell what was said about the price; it was lower a great deal; it was six shillings a piece at first, and he lowered to seventeen shillings for the whole; bantered him some; did not like his price the first time; I think I told him I could get them cheaper at another shop; don't remember what he said, or what he did. He acted wild and crazy; he kept stepping around and turned around; set the chairs around very smart; did not tell me how they were made. I remember the time, for I went to work at Ingersoll's on the 11th, this was three days before.

*Direct resumed.*—I did not think him hardly right the last time; eyes did not look so bad.

*L. H. Allen,* sworn for defence: I reside in this town; I know defendant; met him at a public meeting, can't say when it was. I remember a sentiment which he advanced in some connection with the meeting, defendant made some remarks about education, said he believed it was productive of more evil than good, that it was more calculated to encourage evil and iniquity than

morality; did not notice his manner or appearance. What he said indicated a certain state of mind. I thought at the time, the man was in a fair way to be crazy.

*Cross-examined.*—The remark did not go to support any system; he did not speak more than a minute or two. I think I have given the language, think defendant is opposed to slavery; is called a member of the abolition party, think I have heard him drop an occasional remark; the subject of his remark was education, and not any system of education. The meeting was in the Court House; can't now recollect the subject of the meeting; can't say the meeting had any relation to schools. I came here in 1831, have been a practicing physician; knew defendant when a boy, he lived with me a few weeks, fourteen or fifteen years ago, lived with me as a boy. I have known him since, can't tell how much he has lived here since; have known him as a man of business.

*Mrs. Fanny Thurston,* sworn: I am mother of defendant; since he commenced business there have been peculiarities in his deportment and habits; it commenced in 1843; this is earlier than my daughter spoke of in 1845, then a great change came over him, it was in the fore part of that year; it lasted over a year; formerly he had been active, he then became inactive and stupid; did not attend to his business; negligent about his dress, spirits low, at times would hang his head and press it, and tell me not to speak to him, it would kill him; said if I knew how bad he felt I would not speak to him; his face would be red and eyes swollen; the next day he would be pale, eyes bloodshot. He boarded with me; complained he could not sleep, wanted to sleep on the lounge; I said it was too short for him, but he would sleep there, and I placed a chair for him to lay his feet on; he was irregular about eating, has gone all day without eating; when he did eat he ate excessively. Was costive and then relaxed; seemed to follow each other; he has often observed so to me; afflicted so for a week at a time, perhaps more; he was afflicted with bloody piles, often so that he would be pale; I have noticed from his clothes some indications of the piles; since 1845, sometimes has been very industrious and sometimes very slack;

would remain so some months, the spell would come on him sometimes once in three or four weeks; the distress in the head would sometimes last but a little while; sometimes he said there was a tightness about the head, wanted it pressed; eyes rolled around. Spells came on from time to time since 1845, they continued to grow worse; the last two months he was very bad, he appeared to grow silly; we were afraid he would lose his manly powers, his reason; spoke of this to the family. He said sometimes that he was becoming crazy, sometimes an idiot. Never saw a person in their right mind that looked like him; would stand with a strange look, a minute or two, look vacant. On the last part of the first week in January, he was very bad; we were afraid he was losing his reason. On the night of the 16th he grew very bad; I told the family that he was crazy; he sat down to the table and helped himself to food, did not eat any, got up and went away, walked around; heard Mrs. Ransom's description of his illness; had told her that he was crazy before I saw him in his sickness, I concur with her in her statement. Defendant was drying plaster in his house a few days before this unfortunate occurrence; the weather was cold; he remained from eleven to one o'clock at night; he had been up quite a number of nights, perhaps a week; the plaster was not dry when he went in. I was at defendant's house; went there after tea, early in the evening: found defendant and his wife, James Thurston's wife and Mrs. Garrison and child. They sat conversing when I went in; Mrs. Garrison requested defendant to go after Garrison; defendant wanted her to be calm and give up the child; said Garrison would give up the child again to her; defendant said it was getting so late he might not come; she said, oh, go and see him and talk to him; no one came with him when he first came back; he came in alone, said Garrison was at the door and wanted the child; she said he must come in after it, she could not force her from her; Garrison came in and took a chair; the child was in the mother's lap; the child cried, and he said, " why, what do you cry for?" he took hold of the child, and she screamed louder; saw something which passed before my eyes like a glimmering This

is all I distinctly recollect till I stood holding Garrison's head;
defendant stood by my side doing nothing, stood perfectly still;
did not see his looks until I took hold of his left arm and shook
him, and cried out to him, what have you been doing? he
turned around and laid his hand on Garrison's arm. As he
turned I saw him for the first time; he looked awful; his eyes
looked like looking over a precipice; looked strange, appeared
to look off at a distance; I continued to shake him; he did not
appear to move; I shook him again, and he then spoke the first
word; he stood a while and said it was no use; I then saw the
wound, and saw that it was no use. In the afternoon was un-
usually calm, but pale; said Garrison had sent for him; he was
then exhorting her to give up the child. He looked bad, fast-
ened his eyes upon her, and had a strange look while talking
with his sister.

    *Cross-examined.* I went to my son's house at early candle
light; this was the first time that day; he had been at our
house in the morning; after breakfast remained one half hour;
Mrs. Garrison was there I think; think the child was in the
room; we had a conversation about going to see Garrison; I
observed to my son that these things were unhappily so; I told
him to get some friend of Garrison's and go and talk with him;
wanted some man that understood law; I mentioned Mr. Davis;
defendant thought Davis was not so cool and deliberate as
Parker; he suggested Parker; said he thought he knew law as
well as Mr. Davis; he wanted to inquire whether the law
would give the child to Garrison or to Mrs. Garrison; he went
and saw Parker and said the child belonged to Garrison accord
ing to Mr. Parker's opinion; said Parker thought he had better
get some one else to go and see Garrison; something said
about Dr. Lovejoy; defendant said he thought if anybody on
earth could prevail on him he could; he thought he would do
better than any other person; he went to Parker for advice and
Parker told him to get some other individual to see Garrison;
he went expecting to see Parker and Garrison soon after he
left our house; the difficulty between Mr. and Mrs. Garrison
was talked about in the family; he left our house very soon

after breakfast; saw him next at noon; think he eat dinner at home; did not have much conversation with him after that; at noon he said that Parker said that the law was on the side of the father; that the father was obliged to support the child and was therefore entitled to the custody of the child; said he had been to see Garrison; told me nothing that had passed between him and Garrison; said we need not have much hopes of his giving up the child; Mrs. Garrison said she was afraid he would carry it away; defendant said he would do no such thing; he was permanently here and desired the child's happiness; would after a while let the mother have it; we met again at tea time at our house; I think I was through tea; part of the family had not been to tea; no conversation; he said mother won't you come over this evening, as usual; nothing else said; he left and went home; I went over in a few minutes, remained there a few minutes; can't tell the length of time before Garrison came; my son said he talked of coming; the little girl went back and forth from my house to defendant's that day; I heard no conversation except defendant's trying to pacify his sister; said she must give up the child calmly, he said it was the best and only way; defendant was in a weeping mood and said, do it right, don't make a fuss; she said she supposed she must; Mrs. Garrison is not very quick tempered; can't tell whether the defendant was what we might call quick tempered or not; might have been hasty or spirited; more so formerly than late years; think his temper has changed; I saw defendant going out at the door after Garrison came in; should rather think he opened the door; think the door was shut because it was cold weather; don't remember whether he closed the door when he went out; can't tell how long it was from the time he went out till he came in; Garrison took the child from its mother's lap; the child clung to its mother and screamed; don't remember of his asking her to come to him; nothing but the glimmer of the blow that I saw; I knew that the defendant called upon the lady he afterwards married, knew that they corresponded together when she was at Syra-

cuse; he said he thought of marrying her; spoke of her good qualities; never asked my advice about it; he had rented the house to two families; along when he was paying his addresses to the young lady; when he was preparing for house-keeping he repaired his house; tore down partitions and made new walls; he is now thirty-one years of age; can't say that he opened his shop immediately after he was twenty-one; he has usually boarded with me; has had from one to five hands to work for him, just as it happened; when he first opened shop I should not think he had any one with him; the first I noticed was a change from perfect activity to stupidity; sometimes he would work very hard and then he would not work at all; stand around and do nothing; noticed this some in 1843; he seemed to be melancholy when he had the headache; he would have times of standing still sometimes since 1843; stand any where, sometimes in the house and sometimes lean on the table; sometimes lean against the post and stand and look; he has said singular things to me; said, I really believe I am getting crazy; his wife told him so too; I have heard him talk in a wandering way, speaking on religious matters; they were so disconnected I could not remember them; can't remember anything till the last two months; I have heard him speak disconnected things upon religious subjects; can't mention the language; don't remember of hearing him say he was getting crazy until the last two months; he would complain of his head, at the time he made the remark that he would be crazy; he made this remark two or three times; would not go to work the same day; this agony in the head would not last but a short time; he would say don't speak to me you will kill me; the next day he would say 'mother I did not know what I was about; he would talk around the next day; sometimes the spell would last but a short time; the diarrhea would follow the spells; was never dyspeptic; he never took much medicine; I don't know what ne took for his piles; he once had a box of ointment; don't know as he had a physician called, he may have had.

*John M. Parker,* sworn: I am counsellor at law in this vil-

lage; I was some acquainted with defendant; in February last he consulted me; it was on the day of the occurrence in the forenoon; his manner was very earnest; there was something in what he said and the manner he said it that struck me as singular; thought I noticed his mind operated peculiarly.

*Cross-examined.*—He consulted me on the right of Mrs. Garrison to have the child; he said he wanted to consult me on a subject somewhat unpleasant; sat down at my table; said Mrs. G. had the evening before left her husband's house; he was with me an hour; said Mrs. G. had formerly been a Methodist, that she had withdrawn from them and had lately united with them again; he then stopped and said he thought such organizations were unnecessary; said he and G. agreed on the subject; spoke of government organizations; thought they were all unnecessary; said Mrs. G. had been out the evening before to a donation party to the Methodist minister's; that Mrs. G. came in late at night, sat down; Garrison asked her what time it was; she told him he could look at the clock and see, and he then took hold of her and dragged her into a little room where the child lay; that the child screamed; he went to take hold of the child and she escaped from him; he then said she once before had to leave and she thought it was unsafe for her to return to him; he then said he knew him and said he had a bad organism, and he thought it would not be safe for her to return; he said he advised his sister to make up her mind whether to return or not; said that Garrison had sent the child up there that morning and wanted to know if Mrs. G. could retain the child; I told him she could not; told him he had better see Garrison and see if it could not be amicably arranged; said he was going to see Garrison; said his family thought he had better not, that he was too excitable, but he said he thought he could have as much influence with him as any one except Dr. Lovejoy; he then went to see Garrison; when he came back said Garrison did not want to talk much about it then, but would come to his house that evening; did not much think he would give up the child; said he wanted to say a great deal about it; started off, went part way down

stairs; came back and said if I saw Dr. Lovejoy wished me to tell him to go and see Garrison; I know nothing about their religion; nothing except what Thurston told me. What he said that I thought singular was what he said about Garrison, organism, and the church and government organizations.

*Almeda Garrison,* sworn: I am the widow of Anson Garrison; Mr. Garrison and defendant were on intimate terms of friendship; their intimacy was never broken off till his death. When any one censured my husband, defendant would take his part; I never heard an unpleasant word between them; they were much together. Defendant said he could not help it, that his works affected him, that the iron affected his nature. I went to my father's the night before the unfortunate occurrence; staid at defendant's that night; they had but one bed up, and defendant slept upon the floor; he said he was keeping up fires about that time drying the plastering in his house; he was up a number of times that night, went out two or three times, brought a pitcher of water to me and said he did not know but I would want it, I was so restless; should think he was up a good number of times; said he had the headache, was pale. In the morning he prepared to go and talk with Garrison or some of the friends; in the afternoon he said Garrison had sent for him and wanted him to come down; when he came home in the evening he said Garrison was coming after the child and I must give it up, said Garrison loved the child and would take good care of it; Garrison did not come that evening as soon as expected; I suggested to him to go and talk with him; said he did not think Garrison would come, and I had better have a night's rest before I settled it; I then told him I could not wait till morning, and requested him to go for him, I wanted to have it settled; he said he supposed he could go if we thought best; he went and returned very soon; Garrison took the chair and removed it up near where I sat, a little distance from the stove; I was weeping, I did not see the occurrence; the first I saw of defendant I spoke to him and saw he looked very pale and wild, stood like a statue, with his arms down perfectly still, appeared to be looking at a distance; his eyes were very large and glassy,

The People *v.* Thurston.

was not making any motion, occupied this position but a short time. I asked how he could have done such an awful deed, did not look at me, appeared to be looking at a distance, not at any thing. I heard him say, or else heard some one else say, "he could not help it," don't recollect distinctly.

*Cross-examined.*—I did not see defendant when he put on his outside coat, think he had it on when I noticed his strange look, was not buttoning it up; can't say that he had it on in the evening while in the house; don't recollect of seeing defendant go out.

*Hammond D. Pinney,* sworn: I know defendant, and have for ten or twelve years; knew Garrison before his death, about the same length of time; I was acquainted with both and always supposed them to be on very intimate terms.

*Cross-examined.*—I have known defendant as a business man and have dealt with him; my business is drugs, medicines, oils, paints and varnish; have done business with him personally; his habits were not different from other men; have purchased of him; used to be there frequently; purchased of him frequently; never saw that he was different from any other man.

*Direct.*—Never saw any of his fits of depression.

*B. Goodrich,* sworn: I live in Speedsville; lived here nine or ten years ago, during a term of school; Thurston practiced masturbation the whole time; I tried to prevail on him to abandon the habit.

*Cross-examined.*—I was a boarder with him during fourteen or fifteen weeks, a term of school, and slept with him almost continually. This practice occurred almost every night.

*Lucius B. Hudson,* sworn: I reside in New York; resided here five years, when a very small boy, eight or ten years old; am twenty-one now. I slept with Thurston; knew of this practice while I slept with him; am sure it was frequent, but can't tell how often.

(Dr. Allen here stated that witness and defendant lived in his house at the period stated, and that it was fifteen years ago.)

*Catharine A. Tanner,* sworn: I know Mr. Thurston; have known him several years; never saw any thing strange in him

excepting once when he was at our house, one evening, a year and a half ago; I think he seemed to be talking a great deal, and kept moving his chair around in the room.   He came just before supper; my husband was at work at the depot where he went after supper, and I thought Thurston would go when he did, but he staid after *Jim*, (my husband,) went, and he acted so strange that I was afraid of him; he did not go till after Jim came home, and I scolded at him for going away and leaving Thurston with me alone; told him Thurston acted so strange I was afraid of him; he looked wild, kept looking at me and moving his chair around the room, sometimes walking backward and forward; never saw him so before; never saw any other person so.   I had been his washerwoman some time, and from what I saw on his clothes, I should think he had the piles.

*Cross-examined.*—I noticed this appearance on his clothes a good many times; washed two years for him.

*Question.*—How did the clothes look?

*Answer.*—(Witness hesitating.)   That is a question they said they would not ask me in court.

Mr. Spencer.—Well, they have not kept their faith with you, have they?

Witness.—No sir, they have not, (with great emphasis.) He talked about the slave question for one thing; did not talk much on any particular subject; talked so fast, and about so many things that I don't remember all he did say; one thing he said, he was not well calculated to get along in the world and get property as Jim and I did, he was so bad in his head; he said that was one of his great failings, his head was so he could not attend to his business; don't now think of any thing else he said; I forget, it is so long ago, and I never expected to have to tell it.

*Direct resumed.—Question.*—What was the most strange thing you noticed in him?

*Answer.*—His talking so fast and running on as any foolish person would.

Mr. Dickinson, for the defence, here stated this to be all the testimony that they wished to introduce, except that of the

medical witnesses, and desired them to be examined after the whole testimony, on both sides, had been presented.

Mr. Spencer, for the prosecution, thought it was usual, when a defence was presented, to go through with it. They wished to try the case with an open hand.

Mr. Dickinson claimed the same thing for the defence, but said if testimony of a new character should be introduced they would have to call the medical witnesses over again.

The Court thought the defence had better proceed.

Mr. Spencer assured the defence that the further evidence to be introduced by the prosecution would be of the character of Mr. Pinney's.

Mr. Dickinson.—That is enough. Then we will proceed to call our medical witnesses.

*Dr. Nathan D. Benedict*, sworn: I reside in Utica, and am the physician and superintendent of the New York State Lunatic Asylum at Utica; I have been subpœnaed on both sides of this case; I have been familiar with the insane about five years; have had charge of two large establishments, and perhaps in all not less than 3000 insane patients; I left 463 or 465 in the institution at home; I first saw John M. Thurston in the Spring of this year; I believe he did not know my professional character; I attended him in the cell; spent two or three hours in the morning and about the same in the afternoon—perhaps four or five hours in all; I conversed with him, observed his conduct and appearance, and formed the opinion that he was not in a SOUND state of mind; he was in a state of mind bordering on insanity; the influence of being confined upon a mind inclined to insanity would be variable; if there had been excitement before, the mind would be likely to become calm, and the dejection of a melancholic would be increased; I have not examined him this time, nor visited him since I came; he has now less power of mind than he had last Spring; I think so from my casual observation of him; I have been present in court most of the time, and heard all except the direct testimony of the first witness yesterday morning, (Mr. Barber.) I have read the evidence given prior to my arrival; the evidence

presents to my mind a very extraordinary case; I have never seen one exactly like it, nor do I know of a case on record precisely like it. This case I am constrained to think, taking all the various symptoms as stated by the witnesses to be true, and taking all the circumstances together, is one resembling, if it be not decidedly such as is described in the books as instinctive or impulsive mania; I believe that to be a form of insanity, although I do not know that it is a form universally allowed; I believe it is allowed by the most of persons conversant with the insane; the case embraces all or many of the features of an ordinary case of insanity, as it commences and progresses to its completion. The history of the case shows it to belong to a family where insanity prevails to a great extent; he appears to have been a masturbator which in nearly all cases affects both body and mind; he appears to have had physical disease, disease of the body, constipation, piles, headache, and these headaches accompanied by depressions, stupidity, dullness, unhappiness and occasional excitement which was denominated by some of the witnesses as " crazy;" they seemed to present to my mind a train of circumstances which would lead to insanity; the act itself, perhaps, to my mind presents the strongest feature of the case, being almost entirely without motive. I have not been able to see any premeditation, and if we believe all the testimony, there was entire unconsciousness at the time of the act, and no attempt at escape or concealment; in my interview with him he desired execution, desired to die; I think it a case of approaching dementia; the whole subject of insanity is to me a very difficult one; the more I observe the insane, the more difficult I find it to decide as to the sanity or insanity of those cases that most nearly approximate to the sane; I believe there are forms of insanity without any hallucination or delusion.

*Question.*—How far would the friends and neighbors in the ordinary transactions of business with him be apt to detect his state of mind?

[Objected to, but the Court ruled the question admissible.]

In all the forms of insanity I should place very little reliance

The People *v.* Thurston.

on what ordinary observers say; in impulsive insanity the act itself is often almost the only evidence of insanity; I speak of the antecedent and subsequent state of the person. Hereditary taint is considered one of the frequent and common causes of insanity; I believe there are cases where there is no other cause but hereditary predisposition; insanity is supposed to produce masturbation, as well as masturbation insanity; some entertain the opinion that masturbation is the evidence of insanity, rather than the cause. The mental feelings and internal condition of a person rather than any external cause operating upon him, produce these impulsive paroxysms. I believe the condition of the insane, immediately after an outbreak, to be usually very different; my own observations and reading show them to be very different; I have known cases where there was no consciousness of the paroxysm; the paroxysm was a blank, and they had no knowledge of it whatever; I do not now recollect any particular case described in the books. We have a large number of patients laboring under homicidal and suicidal monomania; what are termed monomaniacs are gen erally rational upon all subjects except the one upon which they are insane; I have one patient who is entirely rational sometimes for four months at a time, and then becomes suddenly entirely unconscious and very suicidal; I should say the insane are as variable in their insanity as sound minds are in their sanity, or in other words, there is as much difference between insane men as between sane men; the insane present all the combinations and mixtures and peculiarities of character that the sane do.

*Cross-examined.*—The patient I spoke of is a female; she has been there about a year and a half; it is very difficult, as a general rule, to detect and decide upon the doubtful cases of insanity; there is no difficulty in well marked cases; I should think there was no difficulty in the popular mind as to what they call insanity; it gives external evidence as a general proposition; as a general rule insane persons are not paroxysmal; I believe this instinctive, impulsive form of insanity

is one that is now generally admitted by authors and persons familiar with the insane.

*Question.*—Can you give any sort of means whatever by which when persons commit these acts of crime, we can judge with any safety at all between the guilty and the innocent?

*Answer.*—I should think every case would have to be judged of separately and by its circumstances. I believe most cases of impulsive insanity present rather stronger symptoms of its approaches than this. I consider the evidence in this case has shown strong ground for believing that the mind was not in a healthy condition a long time before the act. The piles do not ordinarily produce insanity, nor does constipation, nor diarrhea. Sick or nervous headache often affects people in early life, and they become free from it in advanced age; people are often melancholy and distressed without ending in insanity. People are often unhappy without being melancholy; melancholy is almost insanity. I should say that low spirits, and melancholy are premonitions of insanity; I should think if melancholy continued for weeks it is like insanity; one of the symptoms of dyspepsia is low spirits; dyspepsia sometimes continues a long time without ending in insanity, and it sometimes terminates in insanity; it may be called one of its terminations; dyspepsia may be the result as well as the evidence of disease; it does not arise from the liver; I do not know any connection between the bile and dyspepsia.

*Question.*—What means have we who have not read medical books, better than the ordinary transactions of the business of life, to judge of the sanity of men.

*Answer.*—Probably there is no one better evidence of sanity than that. I should look upon a descendant from insane ancestors as more likely to become insane, and upon that as a predisposing cause. I should think hereditary insanity showed itself, not rarely in descendants. In examinations I endeavor to discover whether insanity prevailed in the ancestors; to know that, adds much to the knowledge of the person, we get an idea of his constitution, we learn that he belongs to a family in which all or many of them inherit insanity, we form some

idea of how it is likely to progress and terminate, we make up
our opinion of a case from all the facts we can gather, and that
is one among many. In a trial of this description, the fact
being established that the ancestors had been affected by in-
sanity would throw light on the subject. It would lead the
mind to give more weight to slighter symptoms; I should give
more weight to them knowing that the patient belonged to an
insane family; from my reading I should think masturbation
not an uncommon practice, I fear not; that practice leads to
almost any and all forms of insanity and shows itself in different
ways, in different constitutions; physically it leads to debility,
prostration and insanity, and if continued after incipiency it
terminates in dementia; its effect is loss of mind; it generally
affects the nervous system; in the early periods of practicing
this, the person often has physical strength to go and labor,
whether physical strength would give way before mental depends
upon the constitution. Every person has certain susceptibilities;
that susceptible part of the system would be affected first. It
would affect the weakest part first; I regard the nervous system as
predominant with Thurston, that is the most susceptible, the
brain is affected in all forms of insanity, and the brain is a
part of the nervous system; I have not heard evidence which
shows this to be a case of general insanity; I think it is not a
case of monomania. There is one form of insanity called moral
insanity; I believe insanity generally depends upon physical
derangement; I regard this as a case of disease of the body
affecting the mind; it is not necessary that there should be any
extraordinary derangement before a sudden outbreak of violence;
a very slight cause may produce it, a single constipation is
enough in the case I have referred to, to make that patient in-
tensely furious; suicidal insanity, is very much more frequent
than homicidal, though homicidal is not uncommon. Thurston's
conversation with me indicated derangement; I should not say
there was proved a decided insane talking, on the contrary his
conversation was quite sane generally; I have formed my opin-
ion of his tendency to dementia from nothing else but looking
at him; his appearance as it strikes my mind is a little different

The People *v.* Thurston.

from that of a dejected prisoner; there is a vacancy in the prisoner which is not indicative of the ordinary anxiety of a criminal; a short conversation with him or examination of him, I should not place great confidence in alone, but in connection with the friendship of the parties, they appearing to have been intimate friends, one of them the husband of his sister, he appearing to have been very fond of him, his intercourse with the victim seeming to be unlikely to be followed by such a transaction, all these make up my conclusion. The publicity of the act, the want of premeditation and preparation, and the absence, perhaps entire absence of motive, are all evidences of insanity; I have reflected on the difficulty between his sister and her husband, and on the influence the resolved separation might have exerted upon his conduct; I understand him to have agreed with his brother-in-law as to his right to the child.

*Direct examination resumed.*—I repeat that I believe it was an act of insane impulse, done without the control of the will; his holding the head would be only a part of his general conduct.

*Dr. John S. Butler,* sworn.—I reside in Hartford, Conn.; I am the superintendent and physician of the Connecticut Retreat for the insane at Hartford, have been engaged there between eight and nine years; before that I was superintending physician of the city hospital for three years in the city of Boston, in which there was a department for the insane; have lived in Boston and Hartford; nearly twelve years; have had between 1500 and 1600 patients under my charge; have devoted my exclusive time to this department since my residence at Hartford; I first visited defendant a fortnight ago Wednesday, the 2d of October; I presume he did not know my character as a physician; I was not introduced to him as a physician; after passing some two hours with him, I was led to the conclusion that he was an insane man, and all the observation of my visit led to that conclusion; my impression was that he was approaching dementia; I was not alone with him in the jail; before my visit was through I should have felt uncomfortable to have

been alone with him; I should have felt uneasy; I have not examined him since I have been here this time; I have been an attentive observer of him since this trial commenced; I listened attentively and heard the whole evidence in this case this morning, with the exception of the first witness (Goodrich;) I came here Tuesday afternoon, I believe before any evidence was given; taking the evidence that I have heard to be true, it appears to me that it shows the results of the habit of masturbation acting on a predisposition to insanity, and is, with the symptoms of general ill health as detailed by the witnesses, very indicative, previous to the act, of the formative stage of insanity, of which, weighing all the circumstances carefully, it seems to me the act itself was a development; it is in consistency with the previous history, and the act itself appears to me to have been the insane act of an insane impulse; I believe him to be now from his appearance an insane man.

The evidences of general ill health, constipation, piles, diarrhea, pain and distress in the head, flushed face, and the general appearance of the man, his manner at the time of the act and its inconsistency with his attachment to Garrison, are the principal points that I can now recall upon which I ground my belief; unusual sleeplessness is an indication of insanity, but I do not remember that there has been any unusual sleeplessness indicated; the few nights of sleeplessness and disturbance when he was up about plastering his house in a mind predisposed to insanity and when the disease was in a formative stage, would tend to a development of it; quite a proportion of insane patients from my knowledge and experience, are made insane by masturbation; it is a frequent cause of insanity; the conduct of the man after the commission of the act, taken in connection with the other symptoms, would tally with the opinion of his being insane; taking the history of the family and finding hereditary insanity on both sides in connection with his present state, it appears to me that hereditary insanity bears upon his case. It occurred to me when I first saw him that he was a masturbator; he appears now much the same as he did in prison; his present appearance and symptoms look back and

give force and truth to the testimony and the whole case; the present state gives force to the symptoms as well as the symptoms to the present state; his appearance favors the opinion I have given; the effects of the habit of masturbation and his history taken altogether, indicate that result; while he is in that transition or formative stage of insanity, it would be likely to develop itself and break out in an impulsive act; the evidence of his state at the time of the act, is not so conclusive to my mind as his appearance in the prison; his appearance in the prison was quite conclusive to my mind, and the act and his history previous, indicate certainly a very peculiar state of mind; it is a very singular case; I should have more doubt but for the interview I had in prison; but from that interview taken in connection with all the other circumstances, it does appear to me that the act was an act of insane impulse, and that the disease is ripening into dementia.

*Cross-examined.*—I visited him two weeks ago, at the request of Governor Dickinson; before seeing him in prison I saw none of his friends except his counsel; I received a paper from Gov. Dickinson, containing an abstract of the evidence before the coroner's jury; he read to me some minutes of evidence, I forget where taken or how; that was all the intelligence I had of his case before visiting him; I have no recollection of any particular conversation with counsel about his health and habits of life; there is such a thing known as assumed or simulated insanity; it is not common, but it is an occasional occurrence; when it occurs it is usually done to avoid the consequences of crime; my conversation with him of two hours, including the developments of this trial, are all the opportunities I have had to judge of this case; Mr. Camp and Dr. Allen, I think, were with me in the cell; independently of that visit, laying that aside as far as I am able to, and taking the proof up to the time of the transaction for which he is on trial, it appears to me that I do see in that act a development of insanity; it seems to me that that act was the termination—was, I may say, one of those insane impulses; it seems to me that the act was an insane impulse.

The People *v.* Thurston.

*Question.*—Is your opinion on that subject worth any more than that of any other intelligent, sagacious man, looking at all the circumstances of the case?

*Answer.*—It does not become me to say. Every murder does not furnish evidence of an insane mind; such inference does not follow necessarily from a sudden murder; the striking features of this case, that satisfy my mind that that act was the first outbreak of insanity, are the previous history of the man, his predisposition by reason of hereditary insanity, his masturbation, his ill health, and his manner on that evening before and after the act, all these lead me to the conclusion that it was an act of insane impulse; I think I should have drawn such an inference as that if I had not seen him after the act, though I should have been more doubtful and uncertain; still it seems to me that I should; his being able to work is not inconsistent with these symptoms.

A man may have a good degree of bodily health and strength and be a masturbator; masturbation carried to excess does not always produce physical weakness; as a general thing it does not until the latter stages; it makes one indolent but does not deprive him of physical strength; it affects the nervous rather than the physical system; it first developes itself upon the nervous system, making persons shy, jealous and suspicious; the evidence satisfies my mind that the prisoner practiced it to a very injurious extent; the habit with him appears to have been continuous; how frequently it might be practiced without producing a decided injury, would depend entirely on the constitution of the individual.

Where there is insanity in the family, it predisposes the descendants to insanity, and the existence of this predisposition would make other causes produce a greater effect than in persons who have not this predisposition; I would be led to believe the existence of insanity upon slighter evidence than without that predisposition.

*Question.*—Does it uniformly, or pretty frequently, or commonly happen that the descendants of insane parents become insane?

*Answer.*—Few in numbers, compared to the whole, become insane, just as few in numbers compared to the whole of man kind; though a greater proportion of those who have insane ancestors are insane, than of those who have sane ancestors; the thought of being deceived occurred to my mind when I visited the prisoner; I always remember that; my profession as having charge of the insane would not lead me to presume insanity more readily than another, because we are continually to be guarded against receiving those persons who are alleged to be insane, but who are not; I have the whole responsibility of that at home; there was a wildness about Thurston's expression, a singular and peculiar wildness, and a peculiarity of manner which it is hard to describe, but which excited my uneasiness in his presence; it would be difficult to assume wildness; it would be difficult to assume all I saw in the prison; uneasiness of manner is not difficult to assume; I do not often meet with patients who are ready to admit their insanity; I do not remember now any particular remark on that evening that indicated insanity; I saw no insanity in his telling his sister she had better give up the child; his working day after day is not indicative of insanity; carrying on his business, purchasing and repairing his house, are ordinary evidences of a sane man.

*Direct examination resumed.*—Are they at all inconsistent with the other evidences of insanity you have observed?

*Answer.*—No, sir.

*Cross-examination resumed.*—The proportion of the sane to the insane in this country is about 1 to 500.

*Charles H. Nichols,* affirmed: I reside at New York, and am physician to the Bloomingdale Asylum for the Insane, in which there are at this time about 120 patients now under my charge; was connected for two years with the State Lunatic Asylum at Utica, and have had medical charge of the Bloomingdale Asylum for two years and a half. I first saw Thurston on the morning of Tuesday of this week, when I had an interview with him alone, which lasted for about three hours; so far as I know, he was unacquainted with my professional character; I did not come to a positive conclusion from the examination

The People *v.* Thurston.

made at that interview, but I left him with the impression that he was a man of unsound mind, and that his mental state was such that he was liable to break out at any time in impulsive acts of violence, or other extravagance; his appearance on that occasion, certainly gave rise to the thought in my mind, that he might attempt personal violence to myself, so much so that I calculated the consequences of a struggle a little. I have observed the appearance of the defendant during the trial; believe I have heard all the evidence given here in his case; from what I saw of him in the jail, and from all the evidence given in the case, bearing upon the subject of the state of his mind at the time of the act for which he is on trial, I think he was then insane.

I came to that conclusion in this way: taking the history of the case in the order of time, I first consider the hereditary predisposition and then the history of the bodily health of the individual from an early period in his life down to the time of the act; in these I see sufficient cause for mental derangement; then taking his mental history into consideration I think I perceive the existence of mental derangement; causes and their usual effects serve to corroborate each other. My impression is, that he has been a man of unsound mind for some years, and that there has been that particular susceptibility which under circumstances of anxiety and excitement, especially if occurring in a more than usually deranged state of bodily health, rendered him liable to have sudden outbreaks of an extraordinary character, and of such a kind as would most naturally arise from the train of events which at the time led to the impulsive act; I think his mind is now unsound; I mean that he does not possess the usual integrity of the mental powers; I turned my attention at the interview in the jail to ascertain whether he simulated insanity; his physical appearance was consistent with the history he gave me of his health, the general correctness of which has been corroborated by the evidence given here. I was forcibly impressed with the appearance of his eyes; there was not only that indescribable

appearance which I have often seen in such cases, but a great, sudden and rapid dilation and contraction of the pupils, and sometime one pupil dilated or contracted more than the other; these are phenomena that can not be feigned, and indicate disease of the brain.

*Cross-examined.*—I saw some extravagances, but discovered no positive delusions or hallucinations; did not think he had mania; insanity is the generic term; mania is usually applied by professional men to designate derangement of a pretty active kind; did not discover that Thurston had monomania; a man may have delusions and not be a monomaniac; monomaniacs have but one delusion or at most a single class of delusions; I think there has been very considerable physical derangement in this case, but it has not been of that obvious character we see exhibited in fevers for instance; the constitutional derangement was confined mostly to the nervous system; to my mind in every case, and especially in this, the truth of an in any degree suspectedly fictitious physical history, is confirmed, when followed by such a form of mental disturbance as might be expected to grow out of it, and on the other hand a train of physical circumstances being first proved, the existence of a supposed mental disease, is confirmed, when it is such as might be expected to grow out of such causes; in short, causes and effects, when either or both are obscure, throw great light on each other. Causes of disease of the nervous system have been shown in masturbation, piles, costiveness, irregularity both in eating and sleeping; and the actual existence of nervous disease affecting the mind, has been indicated by periods of great depression of spirits accompanied by pain in the head alternating with frivolity of every kind, of greater or less mental obliviousness, of statue-like standing, irregularity in attending to business, and by the fatal act itself; the statue-like standing has been spoken of by several persons, more particularly by the mother and the sister, Mrs. Ransom; I concur with Dr. Benedict that no one symptom which all his case exhibits, is sufficient of itself to prove the existence of insanity, nor do I think as I stated in my direct examination, that an interview

The People *v.* Thurston.

of three hours was sufficient to lead me to the conclusion that he was insane; I said I left him at the close of that interview under the *impression* that he was insane; I mean by unsoundness of mind in this case, that there is that state of mind in which he would be liable to be led to the exhibition of decided symptoms of insanity from extraordinary exciting causes, such for instance as great and pressing anxiety, occurring when there was a little more derangement of bodily health than usual; I would expect a sudden outbreak of violence in this case, because such an event would be a legitimate one in its natural history; his history and present appearance make a stronger impression upon me, because they are consistent with each other; I have had it in view all the time that this might be a feigned case, or that a fictitious case might be framed by the defence; but I do not think it possible, no matter how intelligent or experienced might be the person attempting it, for any one to make up a case whose natural history from beginning to end, whose phenomena as compared with other undoubted cases that are familiar to all practical men, should be so consistent, each part, with every other, and so perfect as a whole; I would not have gone away from that interview and given a certificate of insanity, but I was under the pretty strong impression, when I left, that he was a deranged man; do not know that the narrative he gave me was in itself irrational, though there was a great deal of impertinent digression running through it; I had no other knowledge of the truth of the narrative he gave me than such as was afforded by the narrative itself; the narrative he gave me in regard to the state of his body and mind, contained a series of events which naturally followed each other and led to the conclusion that he was insane; it had its consecutive stages, like the growing up of an individual in his several stages of development; it would be easy for a man to make up a case to his own liking, but not, I think, one of this kind that would deceive me; he went into quite a full history of his life; I propounded inquiries to him and took him backwards and forwards; he told me of occurrences in his life that would be likely to trouble him; did

not mention any difficulty with his cousin; he intimated to me that he had been disappointed in his affections, but did not give particulars; he mentioned an instance of personal violence occurring some years ago; he mentioned the subject of his general temper and was under the impression that it was rather quick; he made an expression something like this, that he "frequently did things that he afterwards did not see why he wanted to do them;" also gave me to understand that he was a man of more than ordinary generous impulses; he gave an account of this particular act (the killing); mentioned the circumstance of his being kept awake nights in drying the plastering of his house, in connection with inquiries I made about his habits of sleep during all his life time; I think the tendency in his case is to dementia; these sudden outbreaks are common in a class of cases, to which I suppose this to belong; there was not only great restlessness (which he might have feigned), but his physical appearance and the expression of countenance, I thought he could not feign; expression of the eye varies in different forms of insanity. From his reading and from his apparent comprehension of the subjects upon which he has read and from the appearance of his head, I think he is a young man of more than ordinary native intellectual powers, but I think it must strike any intelligent observer as it does me, that he is childish in his whole conduct, that he is, as the colored woman first examined expressed herself, "foolish;" his whole history shows to me a good natural mind, considerably reduced in its best state of late, in force and energy. This man's conduct in carrying on his business is to me an evidence both of a right mind and wrong mind; think it a pretty rare exception to the rule that an insane man should carry on his business for years. Insane persons sometimes contract marriage; marriage is sometimes the first evidence of insanity; ordinarily there is no difficulty in discovering insanity when it exists.

*Question.*—Is there any means by which the tribunals of our country can administer justice, if the outbreak itself which strikes down a fellow man, is the first evidence of insanity?

*Answer.*--There is a means which is generally practiced in this country, and is being practiced in this particular case. In France and under some other of the European governments, it is customary to submit doubtful cases to a commission of experienced medical men, who examine the case as long as they desire to, sometimes for months, and when they have satisfied themselves in regard to its nature, report to their proper tribunal accordingly. I see an evidence of insanity in ·the act itself and in the circumstances immediately following it; have reference to his not denying the act, to his manner as testified to by his mother, his expression of countenance, his statue-like standing, the repeated efforts necessary to excite his attention; these several peculiarities are neither of them decisive, each is perhaps trifling in itself, and yet they are events in keeping with the usual history of such cases and do not usually occur in ordinary murders. Taking him to be a sane man, I think his standing as described is singular. To deny the act when so many persons were present, would not necessarily indicate insanity; I think all recorded cases have exhibited some premonitory symptoms before the violent outbreaks.

*Direct resumed.*—I think premonitory symptoms might exist without their being observed. In the jail he did not speak of having any knowledge of ⸱this deed. Neglect of his business does not in itself indicate insanity, but in this case, taken in connection with the manner in which he spent his time when he neglected his business, and the condition of mind and body he was in at such times; these circumstances put together show to my understanding that his carrying on his business gave evidence both of a right mind and a wrong mind.

*Dr. L. H. Allen,* sworn: I visited Thurston in prison with Dr. Butler; had not visited him there before; have enjoyed no opportunities, other than those that have risen in my own practice, to judge of the insane; I have seen insane patients; from what I saw of this man, his appearance, &c., I am led to the conclusion, taken as a whole, that he is a man of unsound mind; I agree in all the general views with the other Doctors who have spoken.

*Cross-examined.*—I. can not say when I reached the conclusion first, that he was a man of unsound mind, but the possibility and probability that he might be insane, were suggested to my mind immediately after the testimony was out at the coroner's inquest, but my mind was held in suspense, I did not know but there might be further development; I have said, I think, that I thought he was insane; I do not know whether I ever conversed with Mr. and Mrs. Jones upon the subject; there may have been some conversation with them about it, but I do not recollect any, nor with Mr. Huntington, nor with Mr. Williams; I never have stated to anybody, or at least never intended to state, that I thought he was not insane, and I say now that if any person ever drew that inference, that he did it without any authority of mine; I can not say when I first came to the conclusion that he was a man of unsound mind; I have reached this conclusion now on the stand; when I heard the testimony on this trial, I had my impressions confirmed; after the testimony before the coroner, the thought suggested itself to my mind in view of the various forms of insanity, that that man might have committed the act under momentary insanity; there was nothing published in that evidence about insanity; I made up my mind from the circumstances attending it; I mean by unsound mind, where any of the intellectual or moral faculties are disturbed in the absence of fever, or introduction of any foreign substance into the system that would produce insanity. I concur with the gentlemen preceding me, that his state is one of approaching dimentia. I am the administrator of Garrison with the widow.

*Prentice Ransom,* re-called: The first time that I can now recall to my mind distinctly that Thurston spoke to me about the difficulties between his sister and her husband, was about five years ago.

Here the testimony closed on the part of the defence.

The following witnesses were then called by the prosecution and being sworn, testified as follows:

*Gideon O. Chase,* sworn: I reside in Owego; have lived here about nineteen years; I have carried on here no mechanical

business though I have worked at cabinet making; have known Thurston ever since I have been in Owego; never had much dealing with him; only worked with him in the shop; that was sometime between 1835 and 1842; have been with him a good deal ever since I have known him; have had frequent conversations with him; can not fix the time of the last conversation with him.

*Question.*—During all your intercourse with him have you ever supposed he was deranged?

Mr. Dickinson objected, saying — that is a matter to be judged of by an expert. We object to taking testimony on that subject from any but experts. We do not object to witnesses stating particular acts, or what the prisoner did and said, but to their stating whether or not they thought him sane we object.

The court said that they did not understand the question to be objectionable, but thought it might be varied in language.

The question was then restated: Have you ever seen any thing singular or improper, or different from other men in his conversation or intercourse?

The counsel for the prisoner continued the objection to that form of the question.

The court ruled it admissible, the counsel for the prisoner excepted and the witness replied — I never did.

*Cross-examined.*—He appears different now from what I am in the habit of seeing other men out of doors; I think his complexion is different; I fancied the other day when I saw him here that I saw a difference about his eyes, and I so remarked to the gentleman who was sitting by me; I thought he looked more wild than he did formerly; he lived some three or four doors from my hotel; in February last my hotel was about as public probably as any of the hotels; the whole street is one of the most public places in the village; persons are constantly passing from the hotel to the depot; my hotel is on the same side as his house; there are shops across the street from it, and other houses join close up to his, and another family was living in a part of his house at the time of the deed.

*Dwight Hazzard* was called for the prosecution and sworn and testified as follows: I reside in Canawana; have resided here; have known Thurston, the defendant, some 13 years; am a cabinet maker; worked in the shop with him somewhere about 1840; have been with him at times almost every day; have boarded with him at the same house something less than a year.

*Question.*—In all your intercourse with Thurston, have you ever seen in him any thing indicative of a deranged mind in any way.

The counsel for the prisoner objected to the question, on the ground that the witness was not a medical man or an expert.

The question was ruled admissible by the court, the counsel for the prisoner excepted, and the witness answered—I have not.

*Cross-examined.* I have known him to be unwell; I have known him to have a cold; have heard him complain of the piles of late years, but not of costiveness; have known him complain of headache; have seen him down-hearted, but not frequently; he was rather peculiar in some respects, but in these fits was not different from other men, his mind was a little different from other men in regard to his political and religious opinions.

*Chauncy Hungerford,* sworn: I reside in Owego; my business is that of carpenter and joiner; have worked in the shop with Thurston a part of two winters, three and four years ago; have known him between seven and eight years; have had business with him several times; have bought of and sold to him different things; have been on intimate terms of social intercourse with him; have never seen any thing in him as a man of business, strange or unusual; he was peculiar in politics and religion; his opinions were different from mine; he maintained his positions strongly, and was very good in argument, I thought; have often heard him discussing these subjects, and in his manner and conversation never discovered any thing strange.

*Cross-examined.*—I mean by intimate terms of social intercourse, that when I have met him I have spoken with him and conversed; I have never discovered that the structure of his

mind was peculiar; never thought any thing about it; have heard of his being unwell; have heard him complain of headache; he was pretty generally at his business; I never thought he was unusually afflicted with low spirits; sometimes he got out of patience with me; I called it pouting, growing out of some trivial matter.

*Warren Reeves,* sworn: I reside in this village; have resided here since my birth; am aged twenty-five; have known John M. Thurston always by sight, more particularly the last two years; I have done business with him; he has been a subscriber to my newspapers; I have never conversed with him only on business; in all my intercourse with him I never knew of any thing strange, singular or unusual in him; never thought of any thing of the kind.

*Cross-examined.*—I have met him and spoken with him in the street; within the last two years all the knowledge I have had of him is, he took my paper and called at the office to get it.

*Abram B. Elston,* sworn: Have worked with him; very little, for him in the same shop; have seen him nearly daily; in all I have known of him, I have never known him to be very singular.

*Cross-examined.*—I think his mind was like that of other men; don't know that I saw any thing different from other men; I think he was eccentric to some extent.

*Direct resumed.*—I mean by eccentricity, that he was more than usually engaged about free soil and abolition.

*Ralph Hibbard,* sworn: I reside in Owego; been here twenty-five years; have known Thurston ten years; I think I knew him when I met him in the street, that is pretty much all; am a cabinet maker; have talked with him sometimes about business, sometimes concerning the trade, the price of work or the price of lumber; don't know as I ever saw any thing singular, strange or peculiar about him.

*Cross-examined.*—I have not had as much intercourse with him as with my neighbors generally; I never knew any thing about his ill turns.

VOL. II.                    15

*John Searles,* sworn and testified: I reside near the depot in Owego; keep a livery stable; first knew Thurston ten years ago, barely got acquainted with him then, and did not see him again till about six years ago; have known him for the past six years; have had dealings with him occasionally; have conversed with him often. In some things I have thought he was singular, I have thought he did not have as many associates as young men generally have; lived more by himself and more secluded; never saw any thing peculiar in respect to his mind; the thought never occurred to me.

*John W. Turner,* sworn: I am a cabinet maker of this village; have known Thurston four or five years; have worked for him, very nearly two; boarded with him; was working for him at the time he was involved in this difficulty; have bought some of his wares; have conversed with him some considerable; he commenced the repair of his house about the last of January of this year; he had usually not more than four of us. I have seen things in him different from my neighbors in general; I have seen the turns that have been spoken of once in three or four weeks. They were a kind of despondent turns; he would not do much of any thing, sometimes they would last a week; sometimes three or four days. He generally made his purchases and sales himself, and continued to do so as long as he continued his business. I have seen nothing else but these spells; they came on suddenly, sometimes with a headache.

*Cross-examined.*—I think he had one of these turns a day or two before this occurrence; they would come on in this way; he would be sitting in the shop, perhaps, in earnest conversation, and all of a sudden he would make some odd expression, then he would stare around, then he would start up and make another odd expression, sometimes it would be, " Well, there, by God," or " Who the devil would have thought of that?" The day before the occurrence I was sick, and confined to my house most of the day; and the day before that, he commenced one of his odd turns; I mentioned it to my family; he worked in the shop during the last week, though not steadily; I think

he only attended to his sales. He was repairing his house; he bossed his house as we call it.

*Edward J. Johnson*, sworn: I have known Mr. Thurston more or less for eight or ten years; have dealt with him some six or seven years; my business is blacksmithing; my shop is across the street from his; have had a good deal of conversation with him down to about the time he was married; I thought he was rather eccentric; though he had a pretty clear mind, I thought there was a peculiar cast to it; that it run in a particular way. His views in regard to crimes were different from those of most people; he thought it more criminal for a man to vote for a slaveholder or a rum seller than it would be to shoot him. I recollect being in his shop one time, when he wanted to settle with me; proposed to jump accounts, or something of that sort, and said he was not going to live long, and complained of being unwell; that was the summer or fall before this affair, and before he was married; he appeared better the next time I saw him, and did not say any thing more about it. I never thought of his being deranged; have heard him argue, and have argued with him; thought his mind was clear; he maintained an argument well, but carried it to extremes. °

*Mrs. Emily Allen*, sworn: I have resided in Owego seventeen years; know Mr. Thurston some, but little; remember the night of this occurrence; was in the house of Mr. Dodd about seven o'clock, half an hour, I should think, before the occurrence; first heard of the occurrence in the conference room of the Baptist church; saw Thurston that evening; saw him first at Mr. Dodd's house; I was there on business and just coming out of the door; Miss Dodd came out with me; we were standing on the steps as Thurston passed, I thought he had a small tin pail in his hand; he passed me and simply bowed. Miss Dodd said, " Did you know Thurston was married?" Hearing the church bell ring, I hurried on to be at the church in season, and overtook Thurston; a word or two passed between us; I said, " I believe you are married," and asked him how he enjoyed keeping house; he replied, " very well." We got to his gate, he passed in and I went along; I did not notice but

he was in a pleasant mood. Miss Jane Dodd said he got milk above there.

*Cross-examined.*—This interview was entirely casual.

*Isaac B. Ogden,* sworn: My cabinet shop is on Main street in this village, near the Post Office; have known Thurston some twelve or fifteen years; he has worked for me and I have talked with him frequently; have seen him sometimes three or four times a day; sometimes not for a week; could not say that I have seen anything singular, strange, peculiar or erratic.

*Cross-examined.*—Each of us had shops in town and sold wares pretty near each other.

*James Hill,* sworn: I reside the next house north of Thurston; have known him fourteen or fifteen years; have dealt with him some but not a great deal; have some acquaintance with him though perhaps not so much as with others of my neighbors; was not much acquainted with him; I never saw anything singular, strange or peculiar in him.

*Chester Dana,* sworn: Am a house painter in this village; have known Thurston twenty-five years; never had dealings with him; have had very little conversation with him; lived eighty rods from him, I should think; have worked in the shop of Mr. Ogden with him, he at cabinet making, I at painting; I have worked there twenty years; he a number of months, I should think less than a year; I have met him often; saw him almost every day; I have never known anything singular, strange or erratic in his mind that would lead me to think he was insane.

*Cross-examined.*—We worked in separate rooms of the shop, though on the same floor.

*Edward G. Gibson,* sworn: I have lived here fifteen years, and have known Thurston during the whole time; never dealt with him; have had conversation with him; lived within eighty rods of him; it never has occurred to me that he was insane; I have known him as the head of a shop carrying on his business.

*Cross-examined.*—The population of Owego is between two and three thousand; it was about two years ago the cars com-

The People *v.* Thurston.

menced running through this village; the railroad company was actively engaged in making the road through the village one or two years before that; since the railroad has been completed, there has been a greater influx of strangers than before, giving more life and activity to business, and less opportunity of noticing my neighbors than before; for the last five or six years I have not met Thurston very frequently; we were together more before that time; if he had had peculiarities I might not have known it.

*Direct resumed.*—I have not given up my old acquaintances because new ones have come in.

*Franklin Slosson*, sworn: I am a merchant; have resided here thirteen years; have known Thurston during that time; in all my intercourse, I have never noticed anything singular, strange or peculiar in him; I have known him as a business man, as the head of a mechanic shop; I saw him on the same evening of this affair go down from his shop and turn towards his house with a lighted candle in his hand.

*Question.*—Did he ever complain to you of pecuniary embarrassment?

Mr. Dickinson objected. That is a new branch of the case and irrelevant to it. The court overruled the objection and the witness replied—" He did not complain of embarrassment, though he spoke of business matters."

I am trustee of a school district here; he owned a lot near the school house and was anxious to sell the back end of it to the school district so he could pay up what he owed on it; I had a small bill against him; I presented it and he said he had considerable difficulty with his wife's partnership just then, and could not pay the bill.

*Charles R. Coburn,* sworn: I have resided in this village sixteen or seventeen years, and have known Thurston the whole time; he was a pupil in my school when he was a boy; I have known him since that period; have had the same intercourse with him as with other neighbors living as far from him; I live between one-half and one-fourth of a mile from him; in all my intercourse with him I have never seen anything strange

or singular about him; some two years ago I heard him speak on two occasions in debating clubs.

*Frederick Parmele,* sworn: Am a carriage maker in this village; have known Thurston some five or six years; have dealt with him quite a number of times; have lived right across the street from him; during all my intercourse with him, I have never seen in him anything singular or peculiar; I have given more orders to other people who would go and trade with him on my account than I have traded with him myself; he never has been in my family much.

*Romeo Woodford,* sworn: I have resided in Owego some thirteen years; am carrying on the hardware business and tin manufacture; have known Thurston ever since I have lived here; have dealt with him since 1842 more or less each year; he made his purchases himself; I have purchased of him; his habits as a purchaser were good; I have never known anything in him extraordinary, erratic, or different from my neighbors.

*Cross-examined.*—He may have had fits of illness and melancholy and I not know it.

*Benjamin R. Sturges,* sworn: I have known Thurston two years; have had dealings with him; I saw him some four or five hours previous to this catastrophe; he was at my carpenter shop to do business with a couple of men making bedsteads for him; he gave his directions about the style, &c. At that time I noticed that he was in great haste and desired to get through his business as soon as possible; I think he said he was in a hurry to go to Mr. Camp's; I saw no more than this anxiety to get through as soon as possible; I have frequently noticed him as a man of business; he always hurried it through as quick as he could, but did it regularly and promptly as far as I knew.

*Cross-examined.*—My acquaintance with him has been very casual; I did not notice his manner so much when he was at my shop just before as I did after this murder; then my mind immediately recurred back to his appearance; I thought he appeared more anxious than I had ever seen him before; after

I knew of it, then it struck me there was something very peculiar in his conduct in my shop.

*Thomas Dodd,* sworn: Have resided in Owego twenty years; have known Thurston ever since I remember any one; have grown up here with him; have never done any business with him; have not often been in his shop; have had no conversation with him of late years; we had a little difficulty a few years ago; I do not know as I have ever discovered in him anything singular, strange or peculiar.

*Cross-examined.*—Did not know of his fits of illness and do not know as I should have known if he had them.

*Abram T. Hyde,* sworn: Have resided in Owego seventeen or eighteen years; my place of business for fourteen months was next door to his shop; have met him and conversed with him often; was in and out of his shop occasionally; I found him sometimes at work at the bench, sometimes selling furniture; in all my acquaintance with him, saw nothing singular, strange or peculiar.

*Cross-examined.*—I associate most with neighbors living nearest to me, and in proportion as they recede from me my associations are less frequent.

*Charles Ogden,* sworn: I am a gunsmith in Owego; my shop is a few rods below Thurston's; I have known him for a number of years, quite intimately, though more so when we were young than for the last few years; I was often in his shop and he in mine; I have not at any time seen anything singular, strange or erratic in him.

*Cross-examined.*—Did not know anything of his private habits.

*William P. Raymond,* sworn: I reside in Owego, some four or five rods from Thurston's place of business; have known him twelve years last July; have kept the Tioga House five years, and the next four years I was justice of the peace and my office was directly opposite the Tioga House; I have met Thurston frequently during this long acquaintance; I have not dealt with him extensively, but have had small deals with him, such as neighbors have; I do not know that in all my acquaint-

ance with him, I have ever seen anything in him of a strange, singular, erratic or peculiar character, nor anything differing from other men of business in town.

*Cross-examined.*—I never knew of his having his turns of illness; never took any more notice of him than I did of any other neighbor.

*R. D. Willard,* sworn: I have been the keeper of the jail since Thurston has been in it; he has not attended to business much, but he has been called on to attend to business; he has assisted his brother in settling up his own accounts; his brother has been in a good many times; business matters have been talked over; memorandums made and handed back and forth; this continued from four to five weeks; his appetite has not been regular; sometimes in taking his food he would say he did not feel like eating anything; I do not know his habits of sleep; he never has complained about that; he has not been in the habit of conversing much with me; his appetite has been more irregular than that of prisoners generally under my keeping; it was more unequal; he never ate excessively.

*Cross-examined.*—He has complained of having headaches; has had physicians three or four times; if he was sleepless, I should not be very apt to know it.

*Charles T. Bell,* sworn: I lived in part of Thurston's house two years; moved from there last May; it was adjoining Thurston's shop; I have had very little dealing with him aside from renting his house; we were in the habit of using the same back yard, and have met him there frequently; I considered that he was pretty ultra in his political and religious views; thought he went to extremes sometimes; he would maintain his viws by argument; this is all I ever saw in him singular, strange or peculiar.

*Cross-examined.*—I have known one or two in this place, although I never conversed with them, who were as peculiar and ultra as he is; I never thought of there being anything peculiar in the operations of his mind; he was singular only in the extent to which he carried his opinions; he discussed them a good deal; I have never known anything about his health; I

have known of his being unwell; I did not know enough of his private habits to know when he was unwell; I had noticed that he was sometimes not as cheerful as at others.

*Doct. Hiram N. Eastman* was called by the prosecutor, sworn and testified: I am a physician and surgeon, and have practiced in this village nearly twelve years; I have known Thurston perhaps ten or eleven years; I have met him frequently during this period and am well acquainted with him; I have never visited him as a patient; have seen him but once in prison — that was last Saturday night with Doctor Allen; before the catastrophe I had never seen anything in my intercourse with him indicative of derangement; in fact I never thought of it; I conversed with him, with Dr. Allen, in the prison about an hour; the time of conversation was mostly occupied by himself; I asked him a few questions; I have formed an opinion of his case; in the first place I would say his appearance was that of a sufferer from extreme mental anxiety, and in connection with that there was an imbecility of manner, some wandering, some forgetfulness, some hesitation in his narration at times; he talked enough to give me an understanding of his case; I have heard the most of this case; I have heard most of the defence — not all.

The counsel for the defendant objected to the witness giving an opinion unless he had heard all the evidence.

I have generally not been able to be here in the morning as soon as the court came in; sometimes for an hour; and I have been called out once or twice; some of the evidence that I did not hear I have read; but there are portions which I have neither heard nor read; I did not hear all of Miss Nancy Thurston's nor all of old Mrs. Thurston's testimony; I can't tell which portion of old Mrs. Thurston's testimony I did not hear, nor which counsel was examining; I was listening with one ear and reading a paper when I heard what I did hear of old Mrs. Thurston's evidence; I can not say that I heard the whole of Mrs. Ransom's.

The counsel for the people then asked the witness, "From

what you have heard of the case, and what you have read of it, and what you know of it, what are your views of it?"

To this question and the evidence called for under it the counsel for the defendant objected, on the ground that the witness had not heard the whole of the evidence, and that it was not competent for the witness to give an opinion upon the evidence as to the prisoner's mental state at the time of the act without having heard the whole of the evidence. The court overruled the objection, to which decision of the court, the counsel for the prisoner then and thereupon excepted.

Witness.—I would simply say, that from the evidence I have heard on both sides and from my personal acquaintance with the man, and from what I have seen of him since his arrest, that there has not been sufficient evidence, to my mind, to show an insane impulse; I do not say there is no obscurity in this case; I have sometimes vacillated in my opinion, but on the whole, taking my previous knowledge of the man, somewhat eccentric as he is and rather ultra in his views, an impulsive man, a man governed rather by impulse perhaps, than by cool deliberation, I incline to consider the issue as not a long premeditated matter, but brought about by excitement at the moment; I would not say temper, I mean excitement in a broader sense than that. The circumstances seem to indicate that he must, for a few days before this, have been under a state of great excitement; and allowing that he was honest in the endeavor to restrain that excitement as any one should, the excitement increasing when the father came for the child, it produced a sort of bursting out of an excitement, perhaps of a mingled character; I don't think it was what might be called maniacal excitement, but it was something like the excitement of anger or revenge when the temptation was strong, or in other words, there was not an entire want of the controlling power of the will. His speaking just after the act, of his sister having been abused the night before, seems to me to show a sufficient motive.

Dickinson.—The witness is not to speak of motives.

Witness.—I have never known a case like it. There are

certain external indications of insanity which the popular mind will detect as well as a physician; when the public fail to detect, the case is an exception as a general rule; I consider the prisoner in a feeble state of mind now; his conversation was somewhat forgetful; he would now and then make a rather weak, childish remark; he is in rather an enfeebled, imbecile state of mind; he talked most of the time and in rather a slow way.

*Cross-examined.*—I have enjoyed no more opportunities than most medical men, in the ordinary practice of their profession, to judge of insanity; I have treated a few cases, though no more than medical practitioners generally; I have refreshed myself by reading, since the occurrence of this case, though I don't know as I have found any new ideas; medical men, men of great experience, if they have good judgment, and those having charge of thousands of insane patients, are the best judges of insanity; I would as a general thing yield my own opinion to medical gentlemen of experience with thousands of insane patients; I do not say I would yield my own opinion to that of any man when I was satisfied such opinion was wrong; I believe a man of experience would be better qualified to judge than myself.

*Question.*—Can a competent knowledge be acquired or enough in your judgment to speak of it with much safety without a large experience?

*Answer.*—Certainly, all other things being equal, a man of great experience is the best judge; I have had two cases of insanity in this village; I consider insanity a generic term; one of the cases would come under the term of mania; I have been called in occasionally to see a third one; two of them I attended as the principal physician for several months; they were very marked cases; one was carried to the Asylum, and the other prepared to go but finally got better and was not carried; one other case I now recollect some years ago that passed out of my hands into the care of another physician; and another still, occurs to my mind, and that was a case of insanity founded on hysteria; none of these case were the result

of masturbation, as they were all females and married women; one, the worst case, was immediately after confinement; one arose from extreme nervous irritation, and the third was an extreme case of neuralgia, followed by hysterical mania in its worst forms. Insanity supervenes more frequently where there has been insanity in the ancestors on one side and more readily still when both sides were thus afflicted.

Question by Mr. Dickinson.—Let us suppose a case; suppose the case of a person now about thirty years of age, of a sensitive and nervous temperament, that the family of his father and also that of his mother, have been afflicted with insanity in numerous cases; that 15 years since he was in the habit of masturbation, practicing it frequently, almost daily; that 10 years since, 9 years since, 4 years since and 2 years since, he is proved to have continued the same vicious practice; that about 1845, he changed for about one year his habits and custom from being steady and industrious to negligence and inattention, so much so as to alarm his friends, working very little and then very immoderately; his habits of dress and attention to his person from neat and tasteful to careless and slovenly, and occasionally indulging in extravagant dress, and conversing on the subject in a frivolous manner. That he should be sad, gloomy and dejected; be afflicted with obstinate costiveness of a week's duration, accompanied by great distress and agony in the head, and followed by piles and diarrhea; that he should at times stand fixed and motionless; his eyes glare wildly; be sleepless; eating irregularly, sometimes abstaining from food an entire day, and then eating excessively; sometimes pale, at other times flushed; that after the expiration of about a year, he should return to his .business and former habits, but should be afflicted with fits of depression, usually intervening from three to five weeks and continuing from three days to a week, and frequently longer, up to February last, during which he would be sleepless with great agony in his head; eyes glassy at times; sad and gloomy by turns; inclined to wander alone; to stand in a fixed posture and gaze vacantly; to eat irregularly; with costiveness as before

stated; with piles and diarrhea intervening; that these fits increased in length and intensity as time progressed; one in January, 1851, being so marked that the person's eyes were wild and glaring, great distress in his head; sleepless with all his usual symptoms in such cases upon him; tossing his head in agony and presenting such an appearance as to cause his mother and sisters to believe him crazy, and to speak of it at the time; that four weeks afterwards he should have another fit of depression commencing; should be engaged late at night for several successive nights in keeping warm a newly plastered room and should thereby be deprived of his usual sleep; that a near and dear friend should be at his own house with his wife, mother and sister, and he should without any adequate cause or provocation, or any warning, seize an axe and kill him suddenly, should give himself up to justice and then at this time should present such an appearance as this person does, what would you say was his condition at the time of the commission of the act?

Witness.—I should say that he was insane; such a case as you have pictured, I should not doubt being one of insanity; would say in justice to myself, however, that, although many of those circumstances which you have supposed are found in this case, still I have not understood this to be a parallel case; no one of these symptoms necessarily prove a man insane; I think masturbation is one very important and general cause of insanity; in some cases it would be one of the first causes; in some it would be one of the last, according to circumstances; costiveness and piles would be other exciting causes; oftentimes these causes do exist without insanity; I have never known a case of sudden outbreak without strong indications of it previously in some form; despondency is one of the premonitory symptoms of insanity; I do not know that I have ever seen a case of decided impulsive insanity; what I consider to be an impulsive act, is a strange, outrageous act, without any motive, where the will is overcome by a blind impulse, to acts of violence; his language gave evidence of imbecility; his mind I think is naturally strong; imbecility would hardly be in-

sanity; though it might end in dementia; it is a suspicious
circumstance; his conversation was somewhat disconnected;
now and then a little wandering from the subject; just like
any other disease, one symptom alone proves nothing or very
little; but taken in connection with the whole history of the
case, it proves a great deal; I am not clear about the case but
taking all the circumstances into consideration as I have viewed
the testimony, the evidences of absolute insanity, what I con-
sider insanity, were not sufficient to produce the conviction in
my mind that it was a case of impulsive insanity; but, still,
my mind is not clear the other way; I regard costiveness,
piles, headache, &c., as symptoms of insanity, and they should
be watched with exceeding care; but at the same time, that
same state of things does exist in other persons, producing un-
governable passion, that after all I would not consider in-
sanity. This state of the bowels may be an effect of a diseased
brain or the cause may be something else; I think the great
majority of persons get over it without arriving at insanity;
we have a diseased brain from constipated bowels and consti-
pated bowels from a diseased brain. Hereditary predisposition
to insanity may naturally lead to masturbation; though because
my grandmother or father, for example, was insane, I do not sup-
pose that that would produce the habit of masturbation in me.

    After the argument of counsel, and a charge from the pre-
siding judge, the cause was submitted to the jury, who found
the prisoner guilty of murder.

    A bill of exceptions having been settled and signed, a certi-
ficate was granted by Justice Monson as follows:

*Tioga Oyer and Terminer.*

The People          } I, Levinus Monson, a justice of the Supreme
      vs.          } Court, who tried this action as presiding judge
John M. Thurston.   }
of said court of Oyer and Terminer, do certify that in my opinion
there is so much doubt as to render it expedient to take the
judgment of the Supreme Court upon the within bill of excep-
tions. Dated October 20th, 1851.

                       LEVINUS MONSON, *Justice Supreme Court.*

*D. S. Dickinson,* for the prisoner.

I. The challenge to the array by the counsel for the prisoner was well taken. The clerk did not " *draw the number specified in such order, in addition to the number of thirty-six.*" The challenge was therefore improperly overruled, and the objection appearing upon the record is fatal. (2 *Rev. Stat.* 513, § 41, 42; 7 *Wend.* 427.)

II. The two questions addressed by the counsel for the prosecution to Nancy Thurston, a witness called by the counsel for the prisoner, were each clearly objectionable, and were erroneously admitted by the court. The *first* sought to charge the prisoner with immoral conduct in a distinct matter; the second to prove it by hearsay.

III. The testimony of Gideon O. Chase, and of Dwight Hazzard, was erroneously admitted. Neither witness, as is shown, were experts, and yet each was permitted to give his opinion of the prisoner's mental condition, without stating a single fact or circumstance upon which it was founded. This is against the doctrine of all the adjudged cases and elementary writers. (*Culver* v. *Haslam,* 7 *Barbour,* 314; 1 *Greenleaf,* 594; 1 *Phillips,* 227; *Norman* v. *Wells,* 17 *Wendell,* 162; *Sears* v. *Shafer,* 1 *Barbour,* 411; *Jefferson Insurance Co.* v. *Cotheal,* 7 *Wendell,* 78; *Morehouse* v. *Mathews,* 20 *Comstock,* 514; *Palmer* v. *Conly,* 4 *Denio,* 374; 9 *Mass.* 225; 8 *id.* 371; 4 *Cowen,* 203.)

IV. The testimony of Dr. Hiram N. Eastman, the only professional witness called by the prosecution to prove the prisoner sane, was erroneously admitted.

This witness was permitted to give his opinion as an expert, upon " *what he had heard of the case, and what he had read of it, and what he knew of it;*" though he stated in advance that he had neither heard or read the testimony of some witnesses whose statements were principally relied on by the counsel for the prisoner to prove him insane. If there are no adjudged cases bearing directly upon this point, it is because so flagrant a violation of the law of evidence was never before attempted.

The following cases show that those who are permitted to

give their opinion of the prisoner's mental condition from the testimony of others should be present and hear the whole evidence. (*McNaughten's Case, Harrison's Digest, vol.* 5, 444; 10 *Clark and Finnelly*, 200; *King* v. *Searle, Harrison's Digest, vol.* 2, 2276; 1 *Moody and Robinson*, 75; 8 *Scott's New Rep.* 595; *Rex.* v. *Wright, Russell and Ryan's Crown Cases*, 456.)

*A. Munger*, (District Attorney,) for the people.

As to objection made to caption of indictment, that there is no such officer as " Justice of the Peace in and for the county of Tioga." Caption not necessary, and no part of indictment. (3 *Cow.* 322.)

The constitutional designation is " Justice of the Peace." (*Art.* 4, § 7, *Constitution*.)

They are designated as Justices of the Peace in each county, for the Sessions. (*Judiciary Act*, § 40; 3 *R. S.* 677).

Justices are strictly justices for the county in all respects except in trial of civil causes. (9 *Wend.* 320.)

In the act relative to religious meetings, they are expressly called " *Justices of the Peace of the county.*" (1 *R. S.* 847.)

The additional words are, at most, surplusage.

As to the drawing the twenty-four additional jurors.

Jurors in criminal cases drawn same as in civil. (2 *R. S.* 819.)

The clerk from the new ballots draws the number of names required, and has no authority to draw any more names, except in case of *known insanity, death or removal*, of a person whose name is drawn. (3 *R. S.* 510.)

No injury has arisen to the defendant, as the panel was not exhausted at the trial.

The prosecution asked Miss Nancy Thurston whether she *knew* that prisoner was charged with *seduction*, or how or whether she had heard of his being charged with it.

Much evidence had been given to show irregularity in prisoner's conduct, sleeplessness, depression of spirits, &c., in 1845.

It was shown that he became that year unluckily attached to

a young lady. This attachment troubled him, we wish to show why this attachment troubled him, and also that charges made against him were sufficient to account wholly, or in part, for his irregularity.

The prosecution asked witness Chase, if he. had seen any thing singular or different from other persons in prisoner's conversation or intercourse.

The objection came too late, as much evidence of the same kind had already been given. (4 *Cow.* 355.)

Defence asked, what was the strangest thing you ever saw in him?

The objection is specific, that witness should not state whether he thought prisoner insane. (1 *Wend.* 418.)

Witness, Hazard, was asked if he had ever seen any thing in prisoner, indicative of a deranged mind, in any way.

Objection that witness was not an expert or a medical man.

This is not a question for an expert. Nothing but long personal observation could furnish the answer; long acquaintance and not science was requisite. (1 *Denio*, 311.)

The question was proper from the difficulty of specification. (4 *Cow.* 355–6.)

It was merely preliminary, and designed to direct to proper points of inquiry. (1 *Starkie Ev.* 124–6, § 14.)

There is much discretion left with the court upon the examination of witnesses, and unless some established rule of law has been violated, this court will not interfere.

Dr. Eastman, a witness, who had been acquainted with prisoner many years, and had visited him recently in prison, and had' heard the most part of the testimony, specifying what part he had not heard, was asked what his views were, from what he knew and had heard of the case.

Objection, that he had not heard the whole evidence.

This objection came too late, the prisoner's witnesses, Dr. Benedict and Dr. Butler, on the subject, had not heard the whole testimony. (4 *Cow.* 355.)

A like question was conceded to be correct, where witness had heard but a small part of the testimony. (4 *Denio,* 16.)

The grounds of his opinion were clearly stated, the question was competent; its credibility would depend upon his declared means of knowledge.

The following opinion was delivered by

CRIPPEN, J.—Nancy Thurston, a witness in behalf of the prisoner, on her cross-examination by the counsel for the people, testified that the prisoner became attached to a lady while she was staying at the house of his father, and it was reported that she became pregnant at that time and during her stay there. The counsel for the people then asked the witness, whether she did not know that the prisoner was charged with it? (the prostitution of said female.) The prisoner's counsel objected to the question. The court overruled the objection and the witness answered, she did not know it when the lady left her father's. The counsel for the people then asked the witness how long it was after she left before witness had any information about it? This question was also objected to by the prisoner's counsel; the court overruled the objection, and the witness answered, that she heard of it in a few days  This testimony was intended to, and went, to prove that the prisoner had been charged with the immorality of prostituting a female while she was an inmate in his father's house, who was a near relative of his father's present wife. I am unable to discover upon what principle the learned judge admitted the above testimony. The prisoner was on trial upon an indictment for the highest crime with which a human being can be charged; he was called upon to defend that charge and nothing more. His conduct in respect to the subject matter inquired of by the counsel for the people was foreign to the charge made against the prisoner; it had no connection therewith.

Although much latitude may be allowed in the cross-examination of witnesses, still, the witness in her direct examination had testified to nothing opening the door to the counsel for the people, to digress so far from the legitimate and important matter involved in the trial as to allow the inquiries to be

made of the witness, relating to specific and particular acts of immorality of the prisoner which had no connection with the main charge made against him. The general character and life of the prisoner under some circumstances might be the subject of inquiry, yet, I am not aware of any rule of evidence which authorized the prosecution to raise collateral issues upon specific charges against the moral character of the prisoner, having no connection with the crime imputed to him in the indictment.

It is not for the court to speculate upon the question whether the evidence could or did probably have any influence upon the minds of the jurors; of this the court can not judge; no human tribunal can determine with safety, or undertake to form an opinion, of the impression which the testimony made upon the jury. Its object and tendency must have been to prove to the jury that the prisoner had been a man of loose moral character, destitute of those high and noble qualities of honor and morality that always adorn the character of the upright and virtuous, and therefore the impression might be produced or fairly indulged that he would be more likely to commit the crime of murder than he otherwise would have been. It opened the door for the remarks of counsel to the jury which might make a strong impression upon their minds highly unfavorable to the prisoner.

The counsel for the prosecution insisted that the testimony was admissible on the ground that much evidence had previously been given on the part of the prisoner, tending to establish that his conduct had been marked with irregularity; that he had been depressed in spirits, uneasy and sleepless, &c., therefore, the evidence was competent, in order to prove that the prisoner's attachment to the young lady and the charge made against him of seducing her were sufficient reasons for his irregular and singular conduct.

I do not subscribe to the soundness of this proposition or think that it affords a sufficient ground for admitting the testimony. It falls far short of meeting the principal ground of objection. The direct tendency of the evidence was to establish a desti-

tution of moral principle on the part of the prisoner; a blot and stain upon his character; a wicked and corrupt heart, regardless of those restraints which all men of correct and just views always possess, all of which was eminently calculated to lead the jury to a conclusion that the prisoner's peculiarities, his want of rectitude and moral restraints, rendered him more likely to commit the offence charged than he otherwise would have been. In a case of so much importance, where the life of a human being is at stake, we do not feel authorized to allow any testimony to be given to the jury which is not clearly legal and proper, where it may by possibility influence the result to the detriment of the prisoner.

Without examining other important questions raised upon the trial and on the argument of the case, I am satisfied that a new trial should be granted for the reasons above stated.

Justice MASON concurred.

Justice GRAY took no part in the decision.

SHANKLAND, J., delivered the following opinion:—The motion for a new trial on the bill of exceptions, taken in this cause, has engaged the careful attention of this court for several terms, and although the court are unanimously of opinion that a new trial must be granted for errors occurring on the trial of the prisoner, we do not fully concur in placing it upon the same alleged error. A majority of my brethren concur in the opinion that it was error in the Oyer and Terminer to permit evidence to prove the prisoner to have been charged with seducing a lady who boarded at his mother's, upon the ground that it tended to prejudice him in the minds of the jury. I shall not dissent from that opinion, for the reason that I have not examined the question with sufficient care to assent or dissent. I place my opinion in favor of a new trial upon other, and to me, more satisfactory legal grounds, which I deem it proper to state somewhat at large.

The prisoner was charged with the crime of murder. The

defence was that the act of killing was committed while he was insane. A large number of witnesses were called and examined in his behalf, who testified to his state of health, habits, peculiar opinions, &c., during a series of years, and tending, as his counsel claimed, to prove him insane. They then called several eminent medical witnesses, who were skilled in mental diseases, and who had heard all the facts testified to by the other witnesses, and who had also seen and examined the prisoner, and asked them their opinion as to the state of the prisoner's mind at the time of the commission of the act. They gave it as their opinion that he was insane. After the prisoner's counsel had closed his case, the district attorney called as a witness, Doctor Eastman, who testified preliminarily, that he had heard most of the case, but not all of it; that he had heard some of the defendant's evidence, some he had read, and other portions he had not heard or read; that part of the time while the testimony was being given in, he was listening with one ear and reading a newspaper, when he heard what he did hear of the testimony of the mother of the prisoner. The district attorney then asked him the following question: " From what you have heard of the case, and what you have read of it, and what you know of it, what are your views of it?" To the question and the evidence called for under it, the prisoner's counsel objected on the ground that the witness had not heard the whole of the evidence, and it was not competent for the witness to give an opinion upon the evidence as to the prisoner's mental state at the time of the act, without having heard the whole of the evidence. The court overruled the objection, and the prisoner's counsel excepted. The witness then gave an opinion unfavorable to the defence. The sources of information from which the witness was permitted to draw his facts, and upon which to base his opinion, were as broad and various as the question he was called upon to answer, indicates, viz: what the witness had *heard* of the case, what he had *read* of it, and what he *knew* of it. It is clear that what the witness had heard of the case out of court, or from any other source than witnesses under oath, or from his own personal knowledge of the

prisoner, would not form a legal foundation, on which to base a professional opinion, nor could it be possible to base such opinion upon evidence read in the newspapers by him. But the witness was allowed to give his opinion of prisoner's sanity, on information derived from such objectionable sources; and he was likewise permitted to give his *views of the case.* This was also improper. On trials involving inquiries as to the sanity of prisoners, a witness should not be permitted to give his opinion on the case, or on the question of guilt, but only on the question of sanity. (*Jameson* v. *Drinkald,* 12 *Moore,* 157.) But the objection made by the prisoner's counsel, to the question put, was not sufficiently specific to reach the criticisms above made, and he can not, therefore, avail himself thereof on this bill of exceptions. I shall therefore confine my attention to that portion of the objection which was clearly and broadly made, that this witness should not be permitted to give a professional opinion on the prisoner's insanity, because he had not heard all the evidence, tending to establish insanity, which the prisoner had adduced.

This is a highly important question, and seems not to have been clearly decided in any adjudicated case, but there are *dicta* to be found in the books, which seem to indicate that in the opinion and practice of the courts, a medical witness called to give an opinion on the question of insanity, where that opinion is to be based upon facts testified to by other witnesses, must hear all the evidence tending to prove insanity. The general rule laid down by Phillips (1 *Ph. Ev.* 290,) is, " The opinion of medical men is evidence as to the state of a patient whom they have seen. Even in cases where they have not seen the patient, but have heard the symptoms and particulars of his case described by other witnesses at the trial, their opinion on the nature of such symptoms has been properly admitted. Thus, on a question of sanity, medical men have been permitted to form their judgment upon the representation which witnesses upon the trial have given of the conduct, manner and general appearance exhibited by the patient."

Upon the discussion which took place in the English house

of lords, in 1843, in consequence of the acquittal of Daniel McNaughten, for the murder of Mr. Drummond, the following question amongst others, was propounded to the judges, in relation to the defence of insanity, viz., " can a medical man, conversant with the disease of insanity, who never saw the prisoner previous to the trial, *but who was present during the whole trial, and the examination of all the witnesses,* be asked his opinion as to the state of the prisoner's mind at the time of the commission of the alleged crime, &c. ? "

To this question an affirmative answer was given, (47 *Eng. Com. Law Rep.* 29.) The form of the question above given, clearly indicates that the medical witness must hear the whole evidence, in order to qualify him to give an opinion. So in *Rex* vs. *Searle,* (1 *M. & Rob.* 75,) it was held, that a medical man *who had heard the trial,* may be asked whether the facts proved show symptoms of insanity? Here again, the medical witness must have heard the whole of the evidence.

So in *McNaughten's case,* (10 *Cl. & Fin.* 200,) it was held that a medical man, *who has been present in court and heard the evidence,* may be asked as a matter of science, whether the *facts stated by the witnesses,* supposing them to be true, show a state of mind incapable of distinguishing between right and wrong. Here again, it is quite apparent that the witness heard the whole of the evidence tending to prove insanity.

So in *Chitty's Medical Jurisprudence, page* 356,) the rule is laid down thus. " The opinion of medical witnesses, who have seen the alleged lunatic, is unquestionably admissible, and although they have not seen the lunatic, yet their opinion *after hearing all the evidence,* whether or not a person having so acted, and evinced such delusions, ought to be deemed a lunatic, it seems, is admissible.

By the criminal law of Scotland, the medical witnesses, who are to give a professional opinion, must hear the whole facts of the case detailed by the other witnesses, whether professional or ordinary, who are examined in the cause; and medical witnesses therefore are exempt from the rule which excludes all

the witnesses from the court room, except the witness under examination, ( 2 *Allison's Cr. Law of Scotland,* 544.)

The above cited authorities, in the absence of even a *dictum* to the contrary, should settle the question in favor of excluding a witness's opinion, who stood in the situation of Doctor Eastman. But in the absence of all authority on the question either way, it seems to me, the legal mind must come to the same conclusion, to which the above authorities tend.

The reason of the rule, which admits the opinions of medical men on questions of insanity, is that they who have devoted their attention for a long time to diseases of the body and mind, become experts in discovering and properly appreciating the physical and psychological evidences of that deplorable malady. They become skilled in the phenomena attendant upon an abnormal mental condition; and the facts bearing on the question of insanity are the letters of the alphabet, by means of which they are enabled to spell out the true mental condition of the patients, and explain it to the jury, who are presumed not to understand the subject. For if the jury had the same skill and science as the medical witness, the testimony of the latter would be useless and inadmissible. The opinions of such witnesses are intended to aid, guide and lead the jury to a true conclusion on a subject often shrouded in impenetrable mystery, and always difficult of solution.

The opinions of medical men skilled in diseases of the mind, are therefore substantive evidence in the cause in the same sense that the evidence of an interpreter of an unknown language, is evidence of the meaning of that language.

It would seem to be a just inference, from the reason of the rule allowing such evidence, that the medical witness should be in possession of all those facts tending to prove insanity, before he should be permitted to give an opinion negativing insanity. His opinion on half the facts of the case on which the jury are to decide the cause, must be utterly worthless, for it may well be that the same witness, with all the facts before him would pronounce a very diffierent opinion.

The People *v.* Thurston.

It is said, that as the jury hear all the facts of the case, they will not overweigh the opinion of a medical witness, who has heard only a part of the facts. But who knows that for a certainty? Who has the right to impose upon the prisoner the hazard of the experiment? It must be remembered that the jury to whom the evidence is addressed, are presumed to be ignorant of the disease, by the rule which permits the opinions of such witnesses; and if so, how are they to distinguish between, and duly weigh the importance of the additional facts known to them, but which the medical witness has not heard.

If the jury possessed the same skill as the medical witness, there would be less reason for the objection to an opinion on a partial statement of the facts, because the jury could be presumed capable of determining the relative importance of the facts known by the medical witness, and those not known by him. But as the jury do not possess the same skill as the medical witness, his opinion, on a partial statement of the facts, must be worse than useless, for it tends to confound and mislead the jury by imposing upon them the duty of at least *attempting* to weigh the relative importance of the facts, upon which the opinion of the medical witness is based, and the other facts in the cause, which were unknown to the medical witness, and did not, therefore, enter into his reasonings in the result arrived at by him.

That jurors are deemed unskilled in the disease of insanity, is evident from the fact that they, as witnesses, would not be permitted to give an opinion on facts testified to by others, whether a person is insane. And it is now a mooted question, whether they can express an opinion on the subject in connection with a relation of the facts, known to themselves and on which such opinion is founded. (7 *Barb. S. C. Rep.* 314.)

It has always, since I have examined the subject, seemed to me to be a clear proposition, that no medical witness should be permitted to express an opinion against the allegation of insanity, until he has heard all the evidence tending to prove

the affirmative of the proposition, and that where the medical witnesses are men of integrity and skill, and all agree that a given state of facts proves insanity, it is the solemn duty of the jury so to pronounce by their verdict. Such, too, is the rule of evidence. *Cuilibet in arte sua credendum est.* Otherwise, you would permit the opinions of a jury, unskilled in the disease of insanity, to overrule the opinions of the experienced medical witnesses on the same state of facts. And so would it be also on other subjects where the evidence of experts is invoked to aid in the attainment of truth.

I do not mean to be understood as holding that the medical witness must himself hear the facts testified to by the other witnesses tending to prove insanity. If those facts are all stated over to him by the court or counsel it is sufficient. And they may be stated hypothetically, as indeed they must be in the nature of things, because the jury are alone the judges what facts are proved. But what I contend for is the essential principle that the basis of facts upon which the medical witness is to reason and build conclusions, must be as broad as that of the jury, to whom they stand in the position of interpreters. From the very nature of the inquiry, there must be an evident distinction between the evidence to *prove* and evidence to *disprove* insanity, for while it is impossible to *negative* the presence of the disease until we have heard and considered all the affirmative evidence tending to prove its existence, yet the converse of the proposition is not true, and the affirmative of the issue may be proved without hearing all the evidence, because some one or more facts may be so decisive of the case as to render all other testimony superfluous and unnecessary. Having arrived at the conclusion on the ground both of reason and authority, that the testimony of Doctor Eastman was erroneously admitted, a new trial must be granted and I will not examine the other alleged errors insisted on by the prisoner's counsel, but will leave them to be corrected or avoided on the new trial.

Conviction reversed and new trial granted.